**UNITED STATES of America,**

v.

**Anthony George BATTLE**

**No. CR. 1:95–CR–528–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 28, 2001.

1304

William H. McKinnon, Esq., Assistant United States Attorney, Atlanta, GA, for Government.

Margaret O'Donnell, Esq., McNally & O'Donnell, P.S.C., Frankfort, KY, P. Bruce Kirwan, Esq., Atlanta, GA, for Defendants.

---

*ORDER*

ORINDA D. EVANS, District Judge.

This post-conviction federal death penalty case, in which a motion under 28 U.S.C. § 2255 has been filed, is before the Court on motions captioned as follows: (1) motion to disqualify Judge Orinda D. Evans, (2) motion to randomly assign Defendant's 28 U.S.C. § 2255 habeas proceeding to another judge, (3) motion to compel BOP to cooperate with ongoing investigation of this case, (4) motion to cease court's continued direction, restrictions upon and interference with the work of habeas counsel, (5) petitioner's objection to the October 2, 2001 statute of limitations and being required to file his 28 U.S.C. § 2255 motion prior to the completion of all necessary investigation which had been hindered by the ruling of the court, or in the alternative, Petitioner's renewed motion to toll the statute of limitations or alternative request for liberal permission to amend. This case is also before the Court for review under Rule 4 of the Rules Governing § 2255 Proceedings in the United States District Courts.

The following facts in the record are undisputed unless noted otherwise. On the morning of December 21, 1994, D'Antonio Washington, a corrections officer at the United States Penitentiary in Atlanta, Georgia, was killed by an inmate. The murder weapon was a ballpeen hammer which struck several fatal blows to the back of Officer Washington's head. The Defendant, Anthony Battle, was arrested immediately after the murder. Defendant was an inmate at USP–Atlanta, serving a paroleable life sentence for the murder of his wife.[1]

1. Mr. Battle's wife was killed on a U.S. Marine Corps base where she was stationed; hence, the federal prosecution.

On the evening of December 21 Defendant was transferred to the Federal Correctional Institute in Talladega, Alabama.

On January 26, 1995, FBI agents Frank Pickens and Tyrone Smith interviewed Defendant at FCI Talladega. According to Agent Pickens Battle orally confessed and said he had killed Washington because he was angry at the guards and Washington was the first guard he saw that day.

On February 14, 1995, Stephanie A. Kearns and John R. Martin were appointed by the Court to represent the Defendant. Ms. Kearns is the Director of the Federal Defender Program, Inc., for the Northern District of Georgia, and Mr. Martin is a criminal defense lawyer in private practice in Atlanta, Georgia, who is experienced in trial and post-conviction work in death penalty cases.

On April 24, 1995, Defendant attacked and injured a corrections officer at FCI Talladega. In mid-August 1995, Dr. Dave M. Davis, a psychiatrist, interviewed Defendant at FCI Talladega for several hours at the request of the defense team. Defendant described his delusions which he claimed controlled his behavior. Based on this interview, and also upon review of a 1987 report on the Defendant which had been prepared at FCI Butner, Dr. Davis made a diagnosis of paranoid schizophrenia, continuous, with prominent negative symptoms. He also made a diagnosis of polysubstance dependence, currently in remission. Tr.2072. Dr. Davis furnished a written report to defense counsel on August 15, 1995, reporting these conclusions. *See* Docket No. 363, also Sealed Docket No. 363.

The indictment was filed on November 21, 1995. Defendant was arraigned on December 4, 1995 and entered a plea of not guilty. On that same date his counsel filed a notice of intention to rely upon defense of insanity at the time of the alleged offense. The government filed a motion for psychiatric examination under 18 U.S.C. § 4241 (competency) and 18 U.S.C. § 4242 (sanity). This motion was granted and Dr. Sally C. Johnson, chief psychiatrist at FCI Butner, was designated by the Court to conduct the examination.

Defendant arrived at FCI Butner on January 10, 1996, and remained there until early May 1996. During this time Dr. Johnson and her assistant, Dr. Mark Hazelrigg (a psychologist) interviewed Defendant and administered numerous tests designed to measure his cognitive and neurological functioning and to determine the presence or absence of psychosis. During the interviews Defendant stated at times that he believed the government had placed implants in his body to monitor him, control his thoughts, and inflict pain upon him.

Drs. Johnson and Hazelrigg determined that Defendant understood the nature of the legal proceedings and the charge against him, and that he would be able to assist his counsel in defending the case. Thus, they found Defendant competent to stand trial. In addition, they did not find the existence of a psychosis and determined that Defendant was faking his claims of delusions and hallucinations. Their diagnosis was: mixed personality disorder, not otherwise specified, with schizotypal, paranoid and anti-social features. Additionally, they made a diagnosis of malingering. These findings were in a written report dated March 21, 1996, which was sent to the Court.

The trial record also reflects that in 1987 Defendant had been observed and diagnosed at FCI Butner by Dr. Johnson while he was awaiting trial on the charge of murdering his wife. The 1987 diagnosis was that Defendant had a personality disorder, with paranoid and schizotypal features, but no psychosis. Dr. Johnson's

1987 report did note, however, that the Defendant presented unusual mannerisms, including grimacing and eye blinking, digressive and vague speech, and that he reported unusual perceptual experiences. While Dr. Johnson did not find that these factors yielded a diagnosis of psychosis, she noted: "Nevertheless, it is possible that they may constitute evidence of a prodomal phase to the onset of schizophrenia despite a history of absence of clearly psychotic features".

Defendant was transferred from FCI Butner to the Paulding County Jail, a facility in the metropolitan Atlanta area, in early May 1996. On May 23, 1996, he was interviewed again by Dr. Davis who reaffirmed his diagnosis of paranoid schizophrenia. At that time Davis also concluded that Defendant has anti-social personality features. That report stated: "It would seem clear that his murder of Officer Washington was related to his delusional system". *See* Docket No. 363, also Sealed Docket No. 363.

In May, July and September, 1996 Dr. George W. Woods, Jr. (a psychiatrist retained by the defense) interviewed the Defendant. Based on these interviews and previous test results from 1987 and 1996, plus the Defendant's medical records from FCI Butner, Dr. Woods concluded that the proper diagnosis was schizophrenia, paranoid type, acute. He opined that when Battle killed Washington he was delusional. He also concluded that the Defendant was not capable of rationally assisting his attorneys in the preparation of his defense. Dr. Woods prepared a written report dated September 23, 1996, so stating. *See* Defendant's Exhibit 56.

In August and September of 1996, Defendant was interviewed and tested numerous times by Dr. Stephen O'Hagan, a psychologist retained by the defense team. The tests administered including many of those administered at Butner by Dr. Ha-zelrigg in January of 1996, and many of the results were similar. Dr. O'Hagan sent a written report dated September 26, 1996, to defense counsel.

According to *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders Fourth Edition* ("DSM–IV"), "The essential feature of the paranoid type of schizophrenia is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect.... These individuals usually show little or no impairment on neuropsychological or other cognitive testing." § 295.30, p. 287.

The DSM–IV defines delusions as "Erroneous beliefs that usually involve a misinterpretation of perceptions or experiences...." The distinction between a delusion and a strongly held idea is sometimes difficult to make and depends on the degree of conviction with which the belief is held despite clear contradictory evidence. DSM–IV, p. 275.

It is generally agreed that schizophrenia waxes and wanes; it is a progressive disease, with a deteriorating course unless treated.

Malingering is defined in § V65.2 of the DSM–IV: "The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs.... Malingering should be strongly suspected if any combination of the following is noted: (1) medical legal context of presentation (e.g. the person is referred by an attorney to the clinician for examination), (2) marked discrepancy between person's claimed stress or disability and objective findings; ... (4) the pres-

ence of antisocial personality disorder." DSM–IV, p. 683.

In the instant case, the government's claim of malingering is specifically addressed to the Defendant's stated belief that implants in his head monitor his thoughts and control his actions, and sometimes cause him pain. Defendant's claim through counsel was that he was delusional when he killed Officer Washington, such that he could not appreciate the wrongfulness of his actions, or conform his conduct to the requirements of law. The government contended at trial that Defendant's claimed belief that implants were controlling his behavior was faked to provide an excuse for his conduct, and that in any event Defendant understood the wrongfulness of killing officer Washington, and did so with premeditation and with malice aforethought.

According to the DSM–IV, "a personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." DSM–IV, p. 629. Personality disorder not otherwise specified is the appropriate diagnosis for a 'mixed' presentation in which criteria are not met for any single personality disorder but features of several personality disorders are present and involve clinically significant impairment. DSM–IV, pp. 630–631.

Both Dr. O'Hagan and Dr. Hazelrigg administered versions of the Minnesota Multiphasic Personality Inventory ("MMPI"), a test designed to identify personality traits and assist in diagnosing mental illness or psychosis. Hazelrigg gave the MMPI–II and O'Hagan the MMPI. The MMPI–II is the revised and updated version of the MMPI. The test contains several validity scales;[2] when the validity scales were scored in the manner prescribed by the makers of the MMPI they revealed that Defendant's scores on the clinical scales were valid. In other words, the validity scales were not elevated in such a way as to indicate that the Defendant had lied in answering the questions, or faked answers to try to look sick, or responded so defensively as to invalidate the test results. The MMPI has one validity scale, the K scale, which is designed to make a correction for those test takers who answer questions in a defensive way. Defendant's K score was calculated on both tests and the results were added to his scores on the clinical scales in the test as required by the test scoring instructions.

The clinical scales on the MMPI include scales for psychopathic deviate (scale 4); schizophrenia (scale 8) and mania (scale 9). A clinically elevated score on any of these scales is not itself diagnostic of mental illness or psychosis, nor is the failure of the score to achieve clinical significance diagnostic of the absence of mental illness or psychosis. Also, the names of the scales are archaic and confusing. For example, the schizophrenia scale (8) is understood today to measure the relative presence of unusual thoughts. It is a thought disorder scale. Scale 4, the psychopathic deviate scale, measures someone's ability to function within society's expectations. Scale 9, the mania scale, measures distractibility and impulsivity.

The MMPI is generally agreed to be difficult to cheat on without getting caught. It is an objectively graded test; the examiner has no discretion in grading it. Also, it is generally agreed that it is difficult for lay persons to figure out how to achieve a particular result on the test.

2. The validity scales are: L, F and K.

On the MMPI–II administered by Dr. Hazelrigg, the Defendant showed clinically significant elevation of only the mania scale. Even after the schizophrenia scale was adjusted by adding Defendant's K score the raw score was 31, below the level of clinical significance. Def. Trial Ex. 31. The two highest scales were psychopathic deviate (two points below level of clinical significance) and mania (five points above the level of clinical significance). On the MMPI administered by Dr. O'Hagan, none of the scales reached the level of clinical significance.[3]

An MMPI which had been administered at FCI Butner in 1987, however, showed clinically significant elevation of the hypochondriasis, psychopathic deviate, schizophrenia, and mania scales.

Other tests administered to Defendant, mainly by Dr. O'Hagan, showed an absence of gross or diffuse brain damage. Both O'Hagan and Hazelrigg gave the Wechsler Adult Intelligence Scale—Revised and both tests revealed a full scale score of 86,[4] which is within normal range. Both administered the Wechsler Memory Scale—Revised and both showed poor results on verbal memory, good results on visual memory, with a full scale score of 81. Both administered the Trail Making Test which is a test of concentration and the results were within normal limits on both tests.

Both O'Hagan and Hazelrigg administered the Rorschach Ink Blot Test to Defendant. On the test given by Hazelrigg, Defendant scored a 3 on the schizophrenia index (not suggestive of schizophrenia). On the one given by O'Hagan, he scored a 4. (suggestive of schizophrenia). The Rorschach is a test frequently used in diagnosing schizophrenia, but it does not have an objective scoring system. Rather, the Rorschach is scored by using the Exner guideline system which allows some discretion to the scorer.

O'Hagan and Hazelrigg disagreed in several respects in interpreting the tests they gave. First, they disagreed on the correct interpretation of the two 1996 MMPIs. O'Hagan asserted that adding Battle's K score to his clinical scores was an insufficient adjustment to take into account Battle's defensiveness while taking the test. O'Hagan contended that a further calculation should be made, that of subtracting Battle's K score from his F score.[5] Under O'Hagan's analysis this number was not something that would be added to the clinical scale but simply used as a supplementary tool in interpreting Battle's MMPI. O'Hagan admitted that there was some controversy in the literature about use of a negative F minus K score, although he pointed out there is considerable literature concerning the utilization of a positive F minus K score. The net of O'Hagan's testimony on this point was that the lack of any elevation of Battle's clinical scores on the MMPI given by O'Hagan was not trustworthy. Therefore, the normal profile indicated on the MMPI given by O'Hagan was discounted by him as not significant to Battle's diagnosis.

Hazelrigg on the other hand did not accept the validity of using a negative F minus K score in interpreting the MMPI. He admitted he was familiar with the com-

---

3. Clinical significance means two standard deviations above the norm, or mean. On the MMPI the norm is 70; on the MMPI–II it is 65.

4. The 1987 WAIS–R yielded a full scale score of 77.

5. The validity scales on the MMPI are L, F and K. L is a "lie" scale; F is a scale reflecting the endorsement of rarely endorsed ideas and K is an index of defensiveness—people who want to "look good".

putation of a positive F minus K score, but he contended there was no precedent for using a negative F minus K score as an aid in diagnosis. His position was that the normal profile presented by Battle on O'Hagan's MMPI, and the reasonably normal profile suggested in the MMPI given by Hazelrigg pointed away from a diagnosis of schizophrenia. Hazelrigg pointed out that the makers of the MMPI do not prescribe the use of an F minus K scale in interpreting the MMPI. If none of the validity scales are elevated, the test is valid.

The second major point of disagreement between the two psychologist experts was whether any of the tests had shown any brain damage. O'Hagan felt this had been shown. He said that the variation in Battle's scores in various subparts of the WAIS–R meant "there is an erratic quality in intellectual processing for this individual".[6] Tr. 1732. He also believed Battle's strong performance on the second part of the Trail Making Test, as opposed with his weaker performance on the first part, "demonstrates strongly the probability that there is an organic or neuropsychological impairment present." Tr. 1749. He testified that the imbalance of Battle's scores on the Wechsler Memory Scale Revised—79 for verbal memory and 93 for visual memory, plus 118 on the attention and concentration scale "is consistent with some erratic quality to intellectual and cognitive processing and memory function". Tr. 1756. He felt this raised questions about the possibility of some problem in the left frontal hemisphere of the brain. Tr. 1756. O'Hagan felt this concern was also highlighted by Battle's performance on the Wisconsin Card Sorting Test, which Battle had difficulty with.

He gave Battle the test three times and the first two times Battle did not finish it. He did poorly the third time. O'Hagan said this pointed to "a very strong likelihood of impairment in brain functioning in the dorsal lateral area of the frontal lobe". Tr. 1773. O'Hagan had also given the Finger Tapping Test in which Battle achieved more taps within a given time frame with his left hand than with his right. O'Hagan opined this also indicated difficulty in the left hemisphere of the brain adjacent to the frontal lobe. Tr. 1782.

O'Hagan admitted, however, that he was familiar with a study which had concluded that 50 per cent of normal individuals have subtest scatter of 7 points, the same as that Battle had on the verbal portion of the WAIS–R. He also admitted that the subtest scatter on the performance portion of the WAIS–R was only 3 points. He testified he did not know whether the 14 point difference between verbal and visual memory indices on Battle's Wechsler Memory Scale Revised was within the norm for the general population. Tr.1981.

Hazelrigg on the other hand emphasized that everyone has some subtest scatter. He said the variation in scores on the subtest of the WAIS–R and the Wechsler show nothing of significance. Hazelrigg said the results on the Trail Making Test which he gave were virtually identical to those of Dr. O'Hagan and he stated the test showed there was no gross brain damage or for that matter "any kind of brain damage". Tr. 2840–41.

O'Hagan characterized Battle's low K scale on the 1987 MMPI as reflecting that Battle took the test in an "open and candid" manner. Hazelrigg testified that in

6. The variation between scaled scores on the verbal subtests was from 6 to 13. On the performance subtest, the variation was from 7 to 10. The overall verbal scaled score was 50 and the overall performance score was 41. Def. Ex. 5.

taking the 1987 MMPI, Battle had been "careless".

Another point of disagreement was over whether the tests reflected evidence of antisocial features. Hazelrigg contended that the MMPIs given by both him and O'Hagan showed a "4–9 profile" in which the high scales are 4 (psychopathic deviate) and 9 (mania). Hazelrigg said people with a 4–9 profile are considered to be antisocial, commit crimes, are manipulative, egocentric and impulsive. Tr. 2608. O'Hagan disagreed that either MMPI showed a "4–9" profile. He disagreed that Battle had a personality disorder with antisocial features.

Hazelrigg also administered the SIRS test—Structured Interview of Reported Symptoms, to Battle. The SIRS test, which was authored by Dr. Richard Rogers, is specifically designed to identify persons who are faking symptoms of mental illness. The test is based on the principle that certain responses are typical of feigners or malingerers and others are typical of honest responders. The test is objectively graded. Hazelrigg's administration of the SIRS showed a 72.2 per cent probability that Battle was being honest in reporting his symptoms on the test.

All of the aforesaid mental health experts except Dr. Rogers testified at the competency hearing before U.S. Magistrate Judge Richard H. Deane in October 1996. Judge Deane, in a 32–page written report and recommendation, determined that Defendant was competent to stand trial. After considering the objections of counsel, and after a de novo review of the record, the Court adopted the report and recommendation in an order entered on November 15, 1996.

Defendant freely admitted to all of the mental health professionals who examined him, including those retained by the defense, that he had killed Officer Washington. They so testified at trial.

On December 30, 1996, Defendant assaulted and injured a guard at the Paulding County Jail.

Before the trial began on February 18, 1997, the Court met with counsel for the parties to discuss a number of pretrial matters. In response to the Court's question defense counsel stated that no final decision had been made regarding assertion of the insanity defense. The Court ruled that no later than opening statement, defendant would be required to make this election in order to facilitate management of the trial and proper rulings on evidentiary issues. The Court further ruled that once defendant had made his election the decision could not be changed.

Defense counsel did state in opening statement that the defense was relying on the defense of insanity and that the Defendant had not understood his actions and had not been able to control his actions when the murder occurred.

Beginning at the time of the voir dire, and at various points during the trial both in and out of the jury's presence, the Defendant stated that he did not want to participate in the trial and that he did not approve his lawyers' strategy of urging his insanity. While the Court was initially inclined to allow Defendant's voluntary absence from the courtroom, it reversed its ruling after government counsel pointed to a Supreme Court decision, *Diaz v. United States*, 223 U.S. 442, 445, 32 S.Ct. 250, 56 L.Ed. 500 (1912), which held that the Defendant's presence is not waivable in a capital case. The Defendant remained in court, at some points stating he had changed his mind and that he had decided to participate. At two points during the trial he was removed from the courtroom for a period of time on account of continued outbursts.

The trial proceeded in these phases: (1) government's evidence on issue of guilt;

(2) Defendant's evidence on issues of guilt and insanity; (3) government's evidence on issue of insanity; (4) Defendant's rebuttal on issue of insanity.

The government's case on the issue of guilt unfolded as follows: Richard Boone, an inmate serving a 15 year sentence, testified that on the morning·of December 21, 1994, Defendant Battle borrowed his hammer.[7] Shortly thereafter a commotion occurred across the cellblock. When officers answered the emergency call, they found Officer Washington lying face down in a pool of blood. One officer saw Defendant holding a hammer. Tr. 1085. Others saw Defendant Battle standing in front of a vending machine. He had blood on his clothing. Tr. 1045, 1110. A bloody hammer was found under the vending machine. Tr. 1005–1007. Washington's head wounds were severe. Tr. 1023. Blood was spattered on the wall. Tr. 1028. According to Robert Willis, a prison guard, Defendant Battle stated on December 21 in response to Willis' question why he had killed Washington, "Fuck him. I had a dance with him. Do you want to dance?" Tr. 1040.

The doctor who performed Washington's autopsy testified that he died from blunt force trauma to the back of his head, specifically blows delivered with a hammer. Tr. 1071.

Inmate William Hester, who was serving lengthy federal and state sentences, testified that on the morning of December 21 Defendant Battle came to his cell and asked him to give an inmate named McGee two telephone numbers which had been written on a piece of paper. The telephone numbers were those of Jim Battle and Gloria Bandy[8] in Tarboro, North Carolina. The paper was admitted at trial as government's exhibit 2–A. Battle told Hester he wanted for them to be contacted

because he was going to be in trouble and would be going to "the hole" later that day. Tr. 1151. Within 20 minutes alarms started going off and a lockdown occurred. Tr. 1154. Later that day Hester gave the paper to an investigator and told him of his discussion with Battle. Tr. 1166.

On January 26, 1995, the Defendant was interviewed by two FBI agents at FCI Talladega. Defendant was advised of his Miranda rights. According to FBI agent Frank Pickens, Defendant Battle stated that he had become frustrated with being bossed around by the guards. Tr. 1259. They bumped into him and did not say excuse me, and they messed with his money orders. He attacked Washington because he was the first guard he saw that day. Tr. 1259. He felt attacking a guard would get him more respect. He admitted hitting the back of Washington's head with a hammer. Tr. 1261. According to the agents, Battle said he was happy he killed Washington, and had no remorse for it. Tr. 1262. Agent Pickens said Battle had said nothing about implants directing his actions, or about hearing voices.

An FBI agent testified that DNA tests had revealed a match between the blood of Officer Washington and the blood stains on Defendant's trousers and shirt. Tr. 1361.

An announced point of disagreement between Defendant and his trial counsel was concerning the issue of whether he should testify on his own behalf. The Court encouraged Defendant to accept his lawyers' advice in that regard, but also told Defendant on the record that he had the ultimate right to make that decision on his own behalf.

The following colloquy occurred outside the jury's presence shortly before the beginning of the defense's case in chief:

7. Boone worked as a plumber in the prison. Tr. 919.

8. Defendant's father and sister.

THE COURT: And you have the right to testify on your behalf. Now, maybe this is a good time for us to talk about that subject.

You have very good lawyers, and Mr. Martin indicated yesterday when we had our conference in chambers that he was going to advise you, or perhaps that he had advised you that it would not be in your best interests to testify in this case.

THE DEFENDANT: Gees.

THE COURT: Pardon me?

THE DEFENDANT: You expect me to believe that?

THE COURT: Well, I'm just telling you what he said.

THE DEFENDANT: That's what he has always told me, but I'm not in agreement with a damn thing they are doing.

THE COURT: Now, let me say this: Your lawyers do, in fact, have your best interests in mind.

THE DEFENDANT: No, they don't. They don't have it at all. There's something else.

THE COURT: Let me do the talking now. You can talk in just a minute.

THE DEFENDANT: You are saying what you are saying.

THE COURT: Right.

THE DEFENDANT: And you believe these guys are actually presenting and preparing the best defense for me, but it's not actually what the facts in this case are. There is something else involved, and it is being covered up, and these people are plodding right along and letting this happen. They are not really trying to get to the main issue of this thing, that I have something implanted in my body that has been implanted, and this stuff is being manipulated through my system, my nervous system, and it is controlling my body.

THE COURT: Yes, sir, I hear you.

THE DEFENDANT: That's the main issue. These people are not trying to address that issue, or expose that issue, but anything. This is what I wanted.

THE COURT: As I said, you will be able to testify if you want to, but I want to make sure you understand the full implications of what you are doing.

THE DEFENDANT: I understand the full implications.

THE COURT: The chances are that your decision to testify is not in your best interests.

THE DEFENDANT: Well, that's what this attorney says.

THE COURT: Well, I'm saying it too, but in the final analysis, every defendant has the right to testify. In other words, you can override your lawyer's decision.

THE DEFENDANT: I intend to.

THE COURT: That's up to you.

THE DEFENDANT: I intend to.

THE COURT: But you do need to understand something, and that is if you do take the stand and testify, the lawyers will have right to ask you questions.

THE DEFENDANT: That's understandable.

THE COURT: And you will have to answer their questions, okay? That's part of the deal. If you get up on the witness stand and testify, you will have to answer the questions that the lawyers on either side may choose to ask you, okay?

THE DEFENDANT: That's understandable.

(Trial Tr. 1372–1374).

Defendant Battle was called as the defense's first witness. In response to his counsel's questions, he testified as follows: Defendant explained the circumstances of his wife's death, which followed a period of his unemployment, distress over the family

finances, discussion of divorce, intoxication, and finally the incident in which his wife was stabbed with a knife. Defendant described his feelings of guilt about her death. Tr. 1380–1387.

Defendant described his incarceration at Butner following his 1987 conviction, his subsequent transfer to FCI Lewisburg and then to USP Leavenworth, and the beginning of his feeling at Leavenworth that he was being manipulated and monitored by prison guards through implants in his body. Tr. 1395–1396. He testified he started hearing voices while at Leavenworth. Tr. 1396. This continued at USP Atlanta. Tr. 1403. He believed that implants had been placed in his body by government agents when he had surgery to repair wounds he received in the 1986 incident in which his wife was killed. Tr. 1405. In response to his counsel's questions Defendant described in detail the feelings he had had immediately before he attacked Officer Washington—his sense that the guards were controlling his thoughts and bodily functions, causing him physical pain, hearing voices. Tr. 1411–1412. He thought killing a guard might put a stop to this harassment. Tr. 1411.

During the government's cross-examination Battle admitted he knew it was wrong to kill another human being. Tr. 1425. He knew Washington was a corrections officer. Tr. 1426. He testified that this was an effort to get rid of the implants in his body. Tr. 1428. On cross examination Defendant admitted he had signed a handwritten statement prepared by FBI agents McGinnis and Johnson on the afternoon of December 21, 1994.[9] *See* Government Exhibit 41. He admitted this statement did not mention implants or his desire to stop the monitoring of his thoughts. Defendant admitted he had initialed each paragraph

of the statement, but stated that there were spaces in between the paragraphs which were subsequently filled in without his approval. Tr. 1439.

Battle admitted he had given inmate Hester a note with his father's and sister's telephone numbers on it immediately preceding Washington's murder. Tr. 1442.

Battle denied having said the following which was a part of Government Exhibit 41:

> Officer Washington always talked a lot of shit. I didn't like him. He fucked with me.

Defendant testified that this portion of the statement was added later by the agents after he signed it.

Battle testified that he could not recall whether he had given this part of the written statement:

> It doesn't bother me that he's dead. People die every day. He fucked with people.

Battle was then asked the following questions and provided the following answers:

Q. It's Officer Washington's fault, but all he did is work there; is that right?

A. He harassed me also. You know, he did things. He said provocative things to me. He slammed my door. He called me black mother fucker and all this other stuff.

Q. So, it's his fault, and you killed him because you didn't like the way he was talking to you; is that right?

A. There was several officers, man, that I could name that harassed me.

Q. So Washington was the officer that just happened to be in the wrong

---

**9.** Prior to trial the Court sustained Defendant's motion to suppress this statement. However, the Court allowed it to be used for the sole purpose of impeaching Battle's trial testimony under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

place at the wrong time, so you killed him; is that right?

A. That could be said.

Tr. 1458.

\* \* \* \* \* \*

A. It's not so much that I stated I was alone when I did this. I know I did express -

Q. Let me finish my question. Did you tell them about the implants?

A. I did express that there was no one else involved.

Q. I'm done with that. Tell me, did you ask them about, did you tell them about the implants?

A. I didn't feel like it was necessary. I thought they already knew.

Q. Answer my question. The FBI agents knew?

A. Yeah.

Tr. 1460.

Q. Well, it didn't matter that they knew you did it. Did you tell them about the implants, yes or no?

A. I didn't think it was necessary. I thought the guy already knew. Why should I go back and express -

Q. Did you ever tell them you killed Officer Washington because of the implants, yes or no?

A. No, I didn't tell those first agents. I told this guy here.

Q. These guys here, but you could have told them at the Atlanta Penitentiary. You could have told the people who were harrassing you.

A. I could have told them.

Q. And you didn't say a word about it, did you?

A. I didn't say a word at that particular time, no, I didn't.

Tr. 1461.

Defendant testified he had not told his family about his implants or the monitoring until "lately" because he did not want for them to be worried about him. Tr. 1465. He stated he had never mentioned the implants in any telephone call he made from FCI Talladega, USP Atlanta, or USP Leavenworth. Tr. 1466. In response to the question "Tell me the name of one inmate who you told about your implants, and your voices, and your pain?" Defendant said "Not one inmate." Tr. 1468.

Defendant admitted he had seen various mental health care professionals while he was at Leavenworth and that he had not told any of them about his implants. He also saw numerous doctors for medical problems and he had not told any of them about his implants.

Defendant admitted that on the day before he killed his wife, they had had an argument and he had said, "We will see who has the last laugh here". Tr. 1514. He denied that he had intended to kill his wife, and denied he had raped or sexually assaulted her. Tr. 1521–22.

FBI Agent Don Johnson testified that he had prepared the original handwritten form of Defendant's confession on December 21 and that contrary to Defendant Battle's testimony, he had not added any portions after Battle signed the statement and initialed the paragraphs. Tr. 1552. He testified he read the statement out loud to Battle before Battle signed it. Tr. 1558.

Defendant next called Eldson McGhee, a former federal inmate now on parole. McGhee testified he had met Battle in 1991 or 1992 at FCI Leavenworth and also knew him at USP Atlanta. They were friends. Tr. 1600. At Leavenworth he noticed that Battle was a loner, Tr. 1599, that he would stare for hours, Tr. 1599, and that he would "get in a corner with his back up against a wall" Tr. 1599. At Leavenworth they had coffee two or three times a week. While both men were incarcerated at USP Atlanta, McGhee and Battle continued to have coffee from time to

time, Tr. 1603. McGhee observed that Battle was still staring for one to two hours at a time, and that he was still a loner, Tr. 1607.

On cross examination McGhee was asked whether either at Leavenworth or at Atlanta Defendant had ever told him that he had implants in his body, that he was hearing voices, that the corrections staff was controlling his thoughts, that he was having burning sensations from the implants, or that there were electrical shocks pulsating through his body from the implants. McGhee testified that Battle had never mentioned any of these things to him. Tr. 1614, 1618.

The next witness was Dexter Graham, a Bureau of Prisons employee at USP Atlanta. He stated he had some recollection of seeing Battle on occasion though he did not really know him. He testified he had noticed that Battle's eyes appeared to be "wandering", Tr. 1628; that he was a loner, Tr. 1629, that he mumbled to himself, Tr. 1629, and that he appeared to be disoriented. Tr. 1630.

David Philpot, an employee of the Bureau of Prisons at USP Atlanta, testified that he had responded to the emergency call when Officer Washington was killed and noticed that Battle "was looking down in a daze". Tr. 1642.

Federal inmate Willie Shirley, serving a sentence for bank robbery at USP Atlanta, testified he had known Battle at Atlanta. Battle never spoke and never socialized with anyone. Tr. 1647. He testified he never had a conversation with Battle about anything. Tr. 1648.

Lucious Johnson, a lieutenant employed by the Bureau of Prisons at USP Atlanta, testified he saw the Defendant after Washington's murder when Defendant had been placed in restraints. Tr. 1664. He then went with Battle and some guards to the prison hospital. Tr. 1664. He denied noticing anything unusual about Battle's posture or gait at that time, except to note that Battle was in leg irons. Tr. 1665.

Donald Little, an employee at USP Atlanta, testified that he had been an officer on the east yard and that he could not remember whether Battle had worked there as an orderly. Tr. 1681. He said he could not recall whether Battle was "constantly late" while he was working for him. He stated he could not recall Mr. Battle's performance as an orderly. Tr. 1683.

Tyrone C. Smith, an FBI agent, testified that he had been one of the officers called to investigate Washington's death on the date it occurred. He had interviewed Donald Little on that date. Little had told him that Battle's performance as an orderly was unsatisfactory on account of constant absenteeism and poor work habits. Tr. 1686. He did not follow proper procedures for the job. Tr. 1687.

At that point, the defense began calling its mental health experts. The first witness was Steven O'Hagan, Ph.D., a psychologist. Before beginning his evaluation of Defendant Battle, he had reviewed the evaluations done in 1987 and 1996 by Dr. Johnson and her associates at Butner and Dr. Davis' report. He had been furnished with medical records from the prison system and a social history. Ms. Kearns introduced him to the Defendant at Paulding County Jail on August 9, 1996. Dr. O'Hagan stated:

> He began to speak in a very uninhibited way about experiences that he was reporting that were, frankly, bizarre, the idea that he was being persecuted by the Bureau of Prisons, that he had implants or some sort of monitoring devices placed in his body that would control his thoughts, his feelings, and various bodily functions. Some of it did get very bizarre in terms of talking about problems he would have with bowel movements because his anus would get

locked in a certain position and cause serious pain, and that he would have difficulty with sexual ejaculation, disclosures that are highly unusual, and the hour went more or less—well, the hour and a half or two hours went more or less like that with Mr. Battle reporting various examples that were occurring of this persecution.

O'Hagan testified this was "a picture very consistent with paranoid schizophrenia." He said that Battle's delusions and hallucinations, together with his rambling and disorganized speech was characteristic of schizophrenia. Tr. 1716. He testified that people with paranoid schizophrenia have psychotic episodes. Tr. 1723.

O'Hagan also administered the Rey 15 Item Memorization Test, a screening test for malingering. The subject is asked to examine a piece of paper with fifteen items on it; the paper is removed and subject is asked to reproduce the drawings on another sheet of paper. It is expected that a test-taker without brain damage could correctly reproduce at least nine items of the fifteen. Battle got 14 out of 15 items correct. Thus, there was no indication of gross brain disorder or dysfunction. Tr. 1763. Also, Battle was not malingering.

O'Hagan administered the Wisconsin Card Sorting Test, a neuropsychological test which is very sensitive to dysfunction in the frontal lobes of the brain. Tr. 1764. This involves matching drawings on cards based on a principle that is unannounced to the test-taker. For example, the first 10 cards are to be matched based on the color of the drawings on the cards; the second 10 cards are to be matched based on the shape of the drawings depicted on the cards. If the test-taker makes a successful match, the examiner will signify that the match is correct without stating why. The test-taker is to discover the guiding principle for each of four sets of 10 cards based on the pattern of responses from the examiner.

O'Hagan testified that Battle performed poorly on the test, becoming extremely agitated when he was unable to figure it out. He tried giving it a number of times, and Battle did poorly each time. O'Hagan said this pointed to "a very strong likelihood of impairment in brain functioning in the dorsal lateral area of the frontal lobe". Tr. 1773.

On the California Verbal Learning Test, a verbal memory test, Battle got a score of 59, about a standard deviation below average. Tr. 1777.

On cross O'Hagan agreed that classic traits of someone with antisocial personality features are that they are deceitful and manipulative; they disregard the rights and feelings of others; they exhibit irresponsible work behavior; and they frequently lie and malinger. Also, they often engage in high risk activities such as alcohol abuse and drug abuse. Tr. 1886.

Dr. O'Hagan testified Defendant had told him that before he killed Washington he had been having fantasies about hurting someone and that he started to think of himself as a soldier on a mission. While he initially got the hammer from Boone to fix something in his cell, he then thought about using the hammer as a weapon to kill a guard. Battle had been thinking about Officer Washington although had not been specifically focused on him. However, on that morning he did encounter Washington and killed him. Battle perceived himself as a hero, as though he were on a special mission. Tr.1942. Thus, O'Hagan concluded that Battle had been delusional on December 21, 1994.

O'Hagan said that when he interviewed Battle on August 9, 1996, he was alert and fully oriented. Tr.1965. Similarly, Battle

was oriented when he saw him on August 14 and October 21, 1996.

When asked whether some paranoid schizophrenics are capable of understanding the nature and quality of their actions, O'Hagan stated "some individuals with paranoid schizophrenia are capable of that at some times or even most of the time, but may have limitations at other times." Tr.2021. O'Hagan admitted that none of the tests he had given were diagnostic of schizophrenia, although he stated that the Rorschach "came close". Tr.2021.

Defendant's next mental health witness was Dr. George Woods, a psychiatrist who practices in California. Dr. Woods testified that a negative F minus K score appropriately measures or identifies a person who is trying to present themselves in a favorable light. Tr.2095. He said there was no controversy about that. O'Hagan agreed that the MMPIs given by Hazelrigg and O'Hagan in 1996 indicated defensive test taking. Tr. 2101. He said "once again, in 1987 the MMPI showed significant problems. It showed disturbed thinking and showed significant problems. In 1996, nine years later, they don't show any problems at all, and, in fact they reflect someone who is at best being defensive." Tr. 2102. He stated that the results on the Wisconsin Card Sorting Test, Finger Tapping and California Verbal Test were abnormal.

He said that in schizophrenia, "the total brain isn't impaired". Tr. 2104. Woods agreed that the SIRS test administered by Hazelrigg showed about a 72 per cent probability that the Defendant was not malingering.

Woods related that Battle had told him about his claimed delusions. Tr. 2115.

Woods' diagnosis was "schizophrenia, paranoid type, chronic". He also concluded that Defendant is not malingering. Tr. 2125.

The defense's final mental health witness was Dave M. Davis, M.D., a psychiatrist who practices in Atlanta, Georgia. Dr. Davis saw Defendant Battle initially on August 15, 1995, at FCI Talladega at the request of the defense. He interviewed the Defendant for approximately three hours on that day. The Defendant described his delusions in detail. Prior to interviewing the Defendant, Dr. Davis had read the 1987 report from FCI Butner.

Dr. Davis described Battle's statements to him in part as follows:

He thought that microdots and microchips had been implanted in his brain, in his body, his chest, and that the chips and microdots somehow sent these messages to computer centers which the police and other people in the government monitored, that they were able to monitor his thoughts and his gestures, that they knew what he was thinking all the time even before he thinks it. And through these microchips and this monitoring system, the government agents were able to control his central nervous system, and able to "order his nerves, and his breathing, and his head," parts of his body, and due to the fact that he had trouble with the military, he felt the Secret Service was also in on the monitoring.

He said that the government agents were able to deliver these electric shocks through his body, and they could speed up his heart, make him catch his breath, make his eyes water, make his skin burn, make his jaw twitch, control his body, and that all of the police knew that this was going on.

\* \* \* \* \* \*

He described to me how he had planned to kill a guard in the yard three times before he killed Mr. Washington. This was another guard, not Mr. Washington, and each time that he would

approach this guard in order to attack him, the guard would walk away from him, and he thought that was because the guard knew his thoughts before he had them, that his thoughts were being somehow transmitted to this guard.

He thought that there was a piece of steel that was planted in his body, and that that would send messages up to the guard tower, and that the prison authorities could communicate through air sounds, blinking lights, blips on a TV screen, and other noises which he said sounded like flushing sounds on the loud speaker. He told me how the little waves that sometimes would go across the TV were directed towards him, and that there were popping sounds on the loud speaker system in the prison, and that that was directed toward him, and it had meaning, and was done to harass him, and it was personally done because of him.

(Tr. 2275–2277).

Dr. Davis described Battle as "a classic picture of schizophrenia". Tr. 2283.

Regarding the issue of malingering, Dr. Davis said:

There were certain things that are very bizarre and unusual that a malingerer doesn't come up with. One of the things he told me is that the guards could do such things as open up his pores, cause him to dehydrate, wither up, drain out the fluids from his body, make his heart beat fast, and make catches in his breathing.

Now, I have never seen anybody malinger who could make things up like that. That's just a bizarre description typical of schizophrenia.

Tr. 2284.

Davis said that the Defendant's suspiciousness, the fact that he bears grudges and is quick to act with anger and is impulsive, plus his facial grimacing and eye blinking is typical of paranoid schizophrenia. Tr. 2289.

Davis interviewed the Defendant again on May 23 and September 15, 1996, at the Paulding County Jail. Defendant claimed that his cell mate had joined the conspiracy to harass him. Tr. 2297. He reiterated his claim that he had a microchip planted in his head. Tr. 2298. Davis stated that typically paranoid schizophrenia when untreated expands and becomes worse as the patient deteriorates. Tr. 2298.

Dr. Davis saw the Defendant again in February of 1997, just before the trial of the instant case. At that time Defendant was located at the Atlanta Pretrial Detention Center. He stated that Battle seemed somewhat better at that time than he had been during the previous visits, particularly the one in September of 1996. Tr. 2313.

Davis testified that schizophrenia waxes and wanes, and it also is affected by environment. Tr. 2301.

He had read the 1996 report from Butner, and did not believe it justified a determination that Battle was malingering. Tr. 2303. Davis found that Battle has some features of an antisocial personality. Tr. 2307.

Davis related that Battle said the following to him concerning the events of December 21, 1994:

And Officer Washington was someone he perceived as particularly unfriendly and harassing him, and he thought-again, he told me that he thought these guards knew what he was thinking all the time, and when he found this ball-peen hammer and he went over to kill Washington, he thought Washington would know it and would leave. But he didn't, and he beat him and killed him with it, and then he hid the hammer, and he thought that Washington was a robot, and that he had special powers that the

other guards had to know what he was thinking and that he was coming, and he didn't really expect when he hit him that the man wasn't going to leave, but when he did, then he tried to conceal it by hiding the hammer.

Tr. 2313.

Dr. Davis also said Battle had stated:

That the officers had been harassing him, that this was going on constantly, and this particular officer was unfriendly, and had been one of those that particularly harassed him.

Tr. 2324.

Battle also told Davis that prior to the murder he had possessed a weapon made of steel which he was planning to use to kill a guard. Tr. 2324–25. He said he preferred to be executed rather than spend his life in prison. He wanted his lawyers to find "a way out" for him. Tr. 2335.

Defendant's next two witnesses identified records from the Defendant's case file at Talladega which showed that he had refused recreation and showers at various times. Next, Defendant's investigator, Susan Miller, identified charts she had created from those files which showed that the Defendant had not showered or taken recreation for large amounts of time during the period from January 1995 until November 18, 1995.

The next witness was Calvin Lamar Hunton, administrator of the Paulding County Jail. Defendant had a shower, soap and towels within his cell so he was not required to leave to shower. Defendant was kept in a two-man cell although he had no cell mate. Tr. 2407. The Paulding County records reflected that Battle consistently ate lunch, but not breakfast or supper. Tr. 2410. At that point Susan Miller retook the stand and testified concerning an exhibit she had created from the information contained in the Paulding County Jail records. The exhibit showed that the Defendant had refused some meals and had refused recreation for large amounts of time.

Defendant's next witness was Ralph Tressel, operations manager of the Cobb County Medical Examiner's Office. He testified that after examining the photographs of the blood spatters at the scene of Officer Washington's murder, he was of the opinion that the blows to Washington's head had been delivered in fairly rapid succession, probably taking no more than a second and a half, two seconds and that the hammer was probably not drawn back "excessively high or hard, and then brought forward." Tr. 2438. He also testified that Officer Washington was probably still alive when he was removed from the area where the incident occurred. Tr. 2458.

With the defense case on the issue of guilt and insanity having ended, the government called as its first witness Arthur Stratman, M.D., an employee of the Bureau of Prisons at FCI Leavenworth in 1993 when the Defendant had been incarcerated there. He described having seen the Defendant on January 29, 1993. Defendant complained of low back pain from having injured his back. Defendant refused to do some of the movements requested by Dr. Stratman for the purpose of evaluating the possibility of malingering. Dr. Stratman determined that pending an electromyographic study, Defendant's activities should be restricted. After Defendant left the examination area, Dr. Stratman saw him. He testified Defendant "walked briskly without the slow, rigid walk that he displayed both in my office and in the hospital corridor. His walk was entirely normal then." He concluded that Defendant had been feigning illness.

Kevin Donovan, Ph.D., an employee of the Bureau of Prisons and a staff psychologist at FCI Talladega testified concerning

1320

his examination of the Defendant on the evening of December 21, 1994. He did a mental status examination and determined that the Defendant was alert and oriented in terms of person, place, time and situation. The Defendant stated to Dr. Donovan that he had no recollection of the assault on Washington. Battle never mentioned implants or being controlled by others or of having people read his thoughts or hearing voices. Tr. 2537.

In its rebuttal case on the insanity defense, the government's first witness was Mark Hazelrigg, Ph.D., a psychologist employed by the Bureau of Prisons at FCI Butner. He said Battle had a so-called 4–9 profile on the MMPI because the two highest scales are the fourth and the ninth. People with a 4–9 profile are considered to be antisocial, commit crimes, are manipulative, egocentric and impulsive. Tr. 2608.

Hazelrigg said he played chess with Battle and said that Battle played a reasonably good game of chess. Tr. 2668.

Battle described his implants to Hazelrigg, including the fact that the government was using the implants to control his thoughts, movements and to cause him pain. Tr. 2672.

Hazelrigg described the Defendant's ability to communicate as follows:

He could always carry on a logical, coherent conversation, sometimes talking about complicated issues, and following the conversation quite well, sometimes talking about kind of irrelevant things. He liked to talk about sports. He is an active sports fan. He could talk about ongoing sporting events, discuss the different teams, their strengths and weaknesses, who the better players were, how the different teams might match up. He could do all of that very adeptly. He could talk about current events. He followed things in the newspapers. He was following—at that time Timothy Mcvey was being charged with the Okla-homa City bombing. O.J. Simpson was on trial, and he was following those events quite closely and making comparisons between his situation as a defendant in a serious offense, and their situation.

Tr. 2679–80.

Hazelrigg said he saw Battle almost every day during the time the evaluation was being conducted at Butner. Tr. 2684.

Hazelrigg testified that there was an explanation for why Battle would not try to manipulate tests such as the MMPI in order to prove the validity of his symptoms. Hazelrigg pointed out that he had been through the tests before and "he knows that there are validity scales within the test, and the validity scales tell the psychologist if they are trying to manipulate the materials or not. He was well aware that there are validity scales associated with these tests." Tr. 2688. Hazelrigg said he had been over the tests with Battle after he took them. Tr. 2688. Thus, "he took it honestly, knowing that if he tried to lie on the tests, that we would detect it." Tr. 2689.

He opined that Battle does not have paranoid schizophrenia and that he is "free from any serious mental disorders". Tr. 2687. He said Battle has some antisocial attitudes but he does not have a disordered thought process.

Hazelrigg commented that overall, Battle's test scores had improved between 1987 and 1996. For example, the testing in 1987 indicated an IQ of 77 as opposed to the 86 in 1996. Tr. 2700. Also, Battle still retained the ability to function in generally the same way in 1996 as he had in 1987. Hazelrigg said it was not consistent with schizophrenia that Battle's condition had not deteriorated over ten years.

He thought it significant that on the MMPI and the PAI, the validity scale

showed that Battle was honestly responding and the tests did not indicate disordered thought processes. Tr. 2700.

He said that a schizophrenic taking an MMPI and PAI will have significant elevations on a number of scales. Tr. 2701. His opinion is that Battle is not now and never has been a paranoid schizophrenic. Tr. 2702.

Hazelrigg talked to Battle concerning his attitudes about the death penalty. Hazelrigg described Battle's attitude as follows:

> Throughout that time it would have been described as ambivalent in that he really couldn't make up his mind. There are many times when he stated he wasn't afraid to die, that he wasn't afraid of death, and there were other times when he said "what I really want is to get back out in society and live as a free person." So, he kind of went back and forth saying in some ways—he frequently stated that if he had to live in prison the rest of his life, he would just as soon die.

Tr. 2893.

\* \* \* \* \* \*

Hazelrigg further commented:

> He's looking at a variety of choices. All of them are really bad. He's serving a life sentence. He's looking at another life sentence at least for the current offense, or he's looking at living in a hospital. It doesn't look like he's ever going to be released from prison, but that's what he wants. So, he's facing the death penalty or life in prison, and the option that he wants, which is to be released, doesn't seem to be realistic.

Tr. 2894.

The government's next witness was Sally Johnson, M.D., chief psychiatrist and associate warden for health services at FCI Butner. Tr. 2908. She began employment at FCI Butner in 1979 as a staff psychiatrist.

A very large proportion of the patients at Butner's hospital suffer from schizophrenia. Tr. 2913. She became chief psychiatrist at Butner in 1988 or 1989.

Dr. Johnson said she explained to the Defendant what the evaluation would consist of at Butner. He said he wanted to talk to his lawyers before it started and that was done. She states he was oriented and understood the information she gave him. Tr. 2964. Battle early on described his delusional system to her. He said that the staff and other inmates were involved in harassing him and that this had been going on for a number of years since he had been at Leavenworth. Tr. 2966. He mentioned there was some kind of a control device that allowed the guards to monitor his thoughts and his behavior and harass him. Tr. 2967. She talked with him about the extent to which this was bothering him and she concluded he wasn't very disturbed about it. Tr. 2968. At Butner Defendant was not in any overt distress. He was eating and sleeping and was sociable with the staff. Tr. 2969.

Battle was in a room at Butner that had an ante room and also a large window on the wall of the room. He was observed 24 hours a day by staff. Records were kept as to whether he ate, slept, showered or had visits. Tr. 2972. Battle did not neglect his appearance while at Butner. Tr. 2974. Dr. Johnson felt by the end of the evaluation period that Battle was not committed to his claimed delusions.

Battle kept up with current events and read the newspaper at Butner. Tr. 2983.

Johnson discussed the insanity defense with Battle. He did not like the idea of being in a prison psychiatric hospital for an extended period of time. Tr. 2998. He asked her if he was found not guilty by

reason of insanity whether he would get out. She told him that he was already serving a sentence and a not guilty by reason of insanity verdict in the new case would not resolve that sentence. Tr. 2999.

The principal diagnosis Dr. Johnson reached was personality disorder with mixed features, paranoid, schizotypal, and antisocial. She also determined that Battle was malingering, and gave him that diagnostic assessment at well. She felt Battle was seeking to present himself as mentally ill to have some mitigating impact on his legal situation. Tr. 3000.

Battle described the murder of Officer Washington to Dr. Johnson.

Q Well, Mr. Battle described to me that although he had thought about killing a staff member after he was incarcerated, that he never actually formally planned to do that until he was in Atlanta. He had thought about it at other institutions while he had been incarcerated, but he didn't actually plan it until he got to Atlanta. That several months before the actual killing he decided that he was going to kill a staff member. He thought about how to do it. He decided to kill a different staff member about three months before the murder, and had actually planned to kill a recreational staff member who worked with the recreation yard, and equipment, and things like that, and had developed a plan to get a weight bar, a piece of equipment on the rec. yard, and to kill the individual with that. This was actually a person that he thought well of, but he was a staff member that he had identified he would have access to commit the homicide.

Q Did he say why he would have picked this particular individual?

A Availability was the principal issue. He had a routine. He knew this person. He thought he could gain access to him, and there was an available weapon, a weight bar or piece of equipment off the yard.

He was to the point of carrying that out by his account on three different occasions, and on each of those occasions he did not because the tower officer on the rec. yard was directly observing him at the time he was about to carry it out, so he did not do it.

Tr. 3003–04.

\* \* \* \* \* \*

Q Did you discuss with the Defendant how he actually carried out the murder of Officer Washington?

A Yes, I did. I asked him about how he decided what kind of weapon he would use. He indicated that during this period of time through, say, October until December, he was thinking about how he would kill someone, and he had considered lots of things. He thought about the weight bar on the rec. yard or a piece of equipment. He thought about what he called a shank which is usually a homemade knife, a sharpened instrument. He was concerned that that would be found if he had that in his possession or in his room.

And then by chance he noticed that there was an inmate plumber who came on the unit very frequently, and apparently sometimes instead of being on his plumbing job came back to watch TV or whatever on the unit. He was on the unit often, and he had a tool belt with a variety of things, but one of the things was a hammer, and he saw it, and he said the idea came in his head there would be a weapon. He could either just take the hammer away from the guy, or he could say I

need to fix something, and see if he couldn't get the inmate plumber to loan him the tool.

So, he anticipated that he could access that and settled on the idea of the hammer as a weapon.

I talked to him more about that, and he in a very abstract way when I said, "Well, why a hammer"?

The bottom line was it was available, but he made it very clear if you're planning to kill someone, what difference does it make what the weapon is? If the person is killed, they are equally dead regardless of whether you use a knife, or a gun, or a hammer, or poison them, or whatever the case may be. So, he settled on the idea of the hammer.

Q From the information that you had about the actual commission of the murder, did you know about a note that had been delivered by the Defendant to another inmate on the morning of the murder?

A Yes, Mr. Battle told me about the note, and I also knew about the note from a review of the collateral information.

Q What did he say about the note?

A Well, Mr. Battle was able to describe to me that activities of that particular morning, and also some of the activities of the days preceding that.

He had called his father and told him that if he didn't call him in the next couple of days, then something had happened, and he just wanted him to know that.

That morning, I guess it was the morning of the 21st, he gave a note with his father's phone number and his sister's phone number on it to an inmate, and told him that if something happened to him, meaning Battle, that they should get in touch with his family, or if they couldn't do it, to pass that note on to yet a third inmate to get in touch with his family.

Q Did he say what he thought was going to happen to him?

A Yes. He told me that on that morning he had decided this was the day that he was going to kill the officer. So, he knew when he got up that morning that this was the day he was going to do it.

So, he anticipated that he would kill or attempt to kill the officer, and that then something would happen to him. His anticipation was that he would be beaten half to death and put in segregation, and that was what he anticipated would happen, but he wanted his family to know what had happened.

Q What did he tell you about the actual assault on Officer Washington on the morning of December 21st, 1994?

A Well, he described the note, and then he described in essence the events transpiring. He got the hammer from the inmate. I believe his account to me was that the inmate had left the tool belt on a chair somewhere on the unit, and he took the hammer. He had the hammer, and he stood there, and then he said the events unfolded, you know, in a way that was almost too good to be true in his assessment, that Officer Washington, who was his intended victim, on that day was there on the unit. He had his back towards him. He had the opportunity. There were no other officers in the immediate proximity.

He said he knew that that morning, although he had intended to kill Officer Washington, that there might be three or even four officers in total in that area, and that the person he might kill may not be Mr.

Washington. That was his intent, but that another officer could come by with that opportunity presenting itself first.

So, there were no other officers immediately in the vicinity, and he was able to by his account come up behind Mr. Washington and strike him numerous times on the head.

Tr. 3005–08.

Regarding why Defendant killed Washington, Dr. Johnson said:

A He gave me multiple reasons for his crime.

\*　　\*　　\*　　\*　　\*　　\*

Q Will you explain that for the jury, please?

A He described to me that he had these things that went together. He felt that the officers harassed him in the sense that they weren't—they didn't respect him. He was treated as a low kind of inmate. He had the assumption that the rationale for that was that his particular crime for which he was serving time, that he murdered a woman, was why people looked down on him, but he perceived himself as being looked down on, and that people didn't like him in particular, and they didn't respect him.

He had asked Officer Washington by his account to replace a lightbulb in the laundry room on one occasion, and Officer Washington had not done it promptly, or had told him he wouldn't do it then, and that had really angered Mr. Battle.

Mr. Battle didn't like the fact that Officer Washington and the other officers shook down his cell, moved his property about, which is a part of looking for contraband or for weapons, and touched his things. He didn't like that. He felt disrespected in that regard. So, he felt

angry at the officers and angry at the system.

He also felt that he had no chance or very little chance of getting out of prison anywhere in the near future. He said for a long time after he came to prison, he thought that maybe after 10 or 12 years he would be paroled, and he would have a chance to go back to the community, but when he came to Atlanta and he sat down and he went over his case with his case manager, correctly or incorrectly, I don't know, he came away with the perception that he was going to serve at least two thirds of his time, which meant he would have to serve another 10 or more years on his sentence, and he thought about that, and decided that he didn't want to spend his life in prison, and he stated to me that he knew that killing an officer would carry a death penalty, and he would rather be dead than spend the rest of his life in prison.

The third thing that he brought up to me was that because of the death or killing his wife, he was at the bottom of the status level in prison, and that he had remorse for killing his wife. He was very ashamed of this. When he thought about himself, it ate away at his self-esteem. He thought there was nothing lower than killing a woman or a child, and that had he killed a man, he would have been viewed differently in prison, but he didn't. And so he developed the idea, as he discussed with me, that if he killed a man, that his status in the prison system would change, that he no longer would be at the bottom, and if he killed a staff, his status would change even more because in the

prison system, the people who struck out against staff are really viewed by the other inmates as very dangerous and not to be trusted. And so his status would change if he could kill a staff member.

And then finally he kind of summed it all up, and he said it's like revenge. Once you decide you are going to take revenge, there's no turning back, and the revenge was for all of the things that had gone on, the fact he was in prison for potentially the rest of his life, the fact that he had killed his wife and he wished he hadn't done that, the fact that people look down on him for that, the fact he did not perceive the staff or the other inmates as giving him any respect, and the fact that he didn't want to spend the next 20 or 30 more years in prison. He was just very angry, and he described that when he killed Officer Washington, he was just so angry and wanted revenge so much that there was no turning back.

So, that's the summary account that he gave me out of all the different times we talked about the murder.

Tr. 3009–12.

After Dr. Johnson's testimony and the playing of a videotape (Government's Ex. 43A), the government rested its rebuttal case.

The defense's surrebuttal witness was Dr. Stephen O'Hagan. He described several studies concerning the hypofrontality theory of schizophrenia (a theory which relates schizophrenic disorders to impaired frontal lobe functioning of the brain) and the utility of the Wisconsin Card Sorting Test, the Trail Making Test, the Wechsler Memory Scale and other tests in identifying schizophrenia. Tr. 3172–3175.

In his closing argument, the prosecutor pointed out that the Defendant had the burden of proof on the insanity defense. The defense had to prove that "the defendant was so delusional that he didn't appreciate right from wrong through clear and convincing, somewhere between a preponderance of evidence and proof beyond a reasonable doubt". The government argued that the element of premeditation was shown by Defendant's effort to notify his relatives that he was going to be in the hole before the murder occurred. In the defense's closing argument, counsel argued that Defendant's killing of Washington was illogical in many ways. For one thing, Battle was sure to be caught under the circumstances. The defense emphasized the evidence showing that the Defendant is a paranoid schizophrenic who suffered from delusions and that he likely was delusional when he killed Officer Washington. Defense counsel compared the credibility of his witnesses to those of the government and emphasized the probable bias of the government experts who are employed by BOP. He argued that it was inconsistent for Battle not to malinger in taking the various psychological tests but to make up delusions.

At the conclusion of the guilt phase, the Court instructed the jury in part as follows:

The Defendant has come into court and has plead not guilty. The effect of his pleading not guilty is to place the burden on the government of proving each element of the offense charged in the indictment beyond a reasonable doubt. If the government fails to do that, you must find the defendant not guilty.

\* \* \* \* \* \*

In order to prove the charge in the indictment, the government must prove the following three elements beyond a reasonable doubt:

One, that the defendant, Anthony George Battle, committed the murder of D'Antonio Washington.

Secondly, that at the time of committing the murder, the defendant was confined in a federal correctional institution.

Third, that at that time the defendant was serving a sentence for a term of life imprisonment.

Section 1118 of Title 18 provides that murder means either first degree or second degree murder.

In order to prove that the defendant committed murder in the first degree, the government must prove the following essential elements beyond a reasonable doubt:

One, that the defendant, Anthony George Battle, killed D'Antonio Washington with malice aforethought.

And secondly, that the killing was premeditated.

\*　　\*　　\*　　\*　　\*　　\*

The defendant in this case has raised the defense of insanity. The defendant, not the government, has the burden of proof as to this defense.

Proving the defense of insanity involves more than merely proving that the defendant suffers from or suffered from a mental disease or defect. Rather, the defendant must prove by clear and convincing evidence that he suffered from a severe mental disease of defect, and that as a result he was unable to understand the nature and quality or the wrongfulness of his acts at the time the crime occurred.

\*　　\*　　\*　　\*　　\*　　\*

If the jury finds that the defendant committed the offense charged in the indictment, but that he has carried his burden of proof with respect to the defense, the jury's verdict would be not guilty only by reason of insanity.

(Tr. 3280–3282).

Utilizing a special verdict form, the jury on March 12, 1997, found that the Defendant was guilty of first degree murder. The verdict form also offered the jury the alternatives of finding the Defendant "not guilty" or "not guilty only by reason of insanity". It also offered the option of finding the Defendant guilty of second degree murder or murder with malice aforethought but not premeditation.

At the penalty phase of the trial, Officer Washington's father, Frederick Washington, was the government's first witness. He described his son's upbringing. He stated his son had never been in any trouble with the law and that he had been a good child. Officer Washington's older brother is an electrical engineer and a college graduate. Tr. 3426. Officer Washington was described as extroverted and sociable. Mr. Washington is a career corrections officer himself. Officer Washington served in the military for six years and then at his father's suggestion applied for a job with the Department of Corrections in South Carolina. Officer Washington had a daughter who lives with her mother in Arizona. He said Washington made support payments. Eventually Officer Washington left South Carolina and obtained employment with the Bureau of Prisons at USP Atlanta. Mr. Washington learned of his son's assault on the day it occurred. He was told he was not expected to live. When the family arrived at Grady Hospital, they were told that Officer Washington was unresponsive and the family decided to disconnect the life support system. He said Officer Washington's brother Mark had taken his death very hard and was unable to handle being at the trial. Mrs. Washington has taken his death hard as well, as she and her son

were very close. She had to attend counseling after his death. Tr. 3450.

The government's next witness was Henry Schealey, a corrections officer at USP Atlanta. Tr. 3470. He testified that he was a close friend of Officer Washington and he said Washington was "real outgoing, an outspoken person." Tr. 3473. He stated he had observed Washington conduct himself as a professional within the prison and that Washington did everything "according to policy". Tr. 3474. He denied that Washington was abusive to inmates. Tr. 3474. He denied that Washington ever used profanity with inmates. Tr. 3475. He felt that if Washington had been involved with drugs he would have known about it. Tr. 3477. He testified Washington had a modest lifestyle. Tr. 3478.

Schealey also testified that the inmates taunted the guards after Washington's murder. Tr. 3482.

The next witness was Anthony Layfield, a corrections officer at USP Atlanta. He testified that Washington was a fair but firm officer. Tr. 3486. He denied ever seeing Washington abuse an inmate. Tr. 3486. He considered Washington a very good friend. Tr. 3487. He testified that Washington was very much against drugs. Tr. 3489. The inmates called Washington "Hawkeye".

Layfield testified that in the wake of Washington's killing the inmates had an attitude. Tr. 3492. If prisoners serving a lengthy sentence or life imprisonment believe nothing else can happen to them it will adversely affect discipline. Tr. 3492. He felt that a death penalty verdict would make the inmates think twice. Tr. 3493.

The next witness was Juel Hawkins, a corrections officer at USP Atlanta. She testified that corrections officers working in the cellblocks are not armed with any weapons. Neither are the corrections officers in the recreational yard. This is be-cause of the possibility that a guard could be overcome by an inmate who would take the weapon. Tr. 3497. She knew Officer Washington and described him as energetic and people oriented. Tr. 3499. She described the modest circumstances of Washington's apartment. Tr. 3500. She never saw or suspected Washington of using drugs. Tr. 3504. She and other officers went to Grady Hospital on the night of Washington's assault. Tr. 3507. She described Washington's close relationship with his family.

She testified that if the death penalty were imposed, it would send a clear signal to the inmates that "you cannot kill a staff member and just absolutely nothing be done about it." Regarding the possibility of a life sentence, she stated that if an individual is already serving a life sentence, another life sentence does not add anything. Tr. 3513.

The next witness was Bessie Foreman, mother of Mr. Battle's deceased wife, Minnie Foreman. For approximately two years before Minnie's death, the Defendant and Minnie had lived with Mrs. Foreman. Tr. 3521. Mrs. Foreman related an incident which occurred on New Year's Eve of 1986. The Defendant and an individual named Ronald Pittman had a fist fight. Battle pushed the man out on the porch, picked up an iron chair and started beating it against the door of the house. Tr. 3525. She was aware that Minnie and Battle were having marital difficulties. On an occasion shortly before Minnie's death Battle was drunk and ran after Minnie carrying a shotgun, threatening to shoot her. Tr. 3528.

The next witness was Margaret Foreman, cousin of Minnie Foreman. She remembered the altercation with Bernard Pittman. She recalled Battle trying to beat the door in. She remembered Anthony and Minnie arguing a week before her

death. Tr. 3538. Battle was taken to jail on the evening he chased after Minnie with the shotgun. Tr. 3541.

The next witness was Ralph Foreman, Bessie Foreman's nephew. He saw Battle with the shotgun on the Saturday night before Minnie was killed. He saw Minnie run out of the house across the field and saw Battle get her in a head lock. Tr. 3545. He wound up wrestling with Battle. The deputy sheriff arrived and broke up the fight. Tr. 3546.

The next witness was Jerry Wiggs, a lieutenant in charge of investigations at the Edgecomb County Sheriff's Office in Tarboro, North Carolina. He was present at the Battles' apartment in March of 1987 when Battle was moving some belongings out. He recalls Battle saying in his presence to Minnie, "We'll see who get the last laugh in this matter". Tr. 3555. This was on a Sunday morning, the day of her death.

The next witness was Steven Lee Counts, previously a corrections officer at FCI Butner. He testified that on August 5, 1989, he was notified that there had been a fight in the unit where Defendant was housed and that he investigated the incident. Officers had entered the commons room and observed Battle attacking another inmate with an aluminum walking cane he had taken from the inmate. A dispute over choice of TV channel triggered the assault. The inmate had superficial abrasions and bruises. Tr. 3561.

The next witness was Harold Harrison, who had been a guard at FCI Butner on August 5, 1989. He stated that as he entered the TV room on that date he observed Battle standing over an inmate and hitting him repeatedly with his fist. Tr. 3568. The other inmate was lying on the floor trying to deflect the blows. Tr. 3568.

The next witness was Gerald Owen, who was employed on April 24, 1995, as a case management coordinator at FCI Talladega. On that date he and other guards were assigned to move inmate Battle from his cell for purposes of an attorney visit. Tr. 3570. He testified there were five or six officers present. Tr. 3571. Battle was placed in cuffs before the officers entered the cell (with his hands through the food slot). Pursuant to usual procedure, the officers then entered the cell to put leg irons on Defendant Battle. Battle then "whirled around to his left and raised his arms above my head and had a weapon in his hand, and started coming down at my face." Tr. 3571. He testified that Battle repeatedly tried to stab him, pushed him down on the floor and continued stabbing him. He got a puncture wound in his back and received some injuries to his spine. Tr. 3572. Officer Owen also had a sprained left ankle, a contusion to the left leg, aggravation of a preexisting compression fracture and a new compression fracture. As of March 1997 he was still under the care of a neurologist. Tr. 3573. The officer thought Battle had had a sharpened toothbrush handle in his hand during the attack but it was not found in the cell. They did find a straightened out paperclip. Tr. 3574. At the time of the attack Battle was in administrative segregation. Tr. 3577.

The next witness was Lieutenant C.A. Collie, a lieutenant at FCI Talladega. He was present at the incident on the date of Battle's attorney visit. He testified about Battle's assault on Officer Owen. He was present when Battle was searched after the attack on Officer Owen. He described it as a pat search. Tr. 3591. Also, he was present when the search of Battle's cell occurred.

The next witness was Paul Gore, a corrections officer at FCI Talladega. He had been present on April 25, 1995, when Battle's new cell (the cell to which he was

moved after the attack on Officer Owen) was searched. This was at 4:00 a.m. Battle was lying on a mattress on the floor. Under the mattress the guards discovered a 7-inch long shank which appeared to be made from a toothbrush and which had been sharpened on the end. Tr. 3649.

The next witness was Ron Smith, a corrections officer at Talladega. He testified that on April 29, 1995, when Battle was served his food tray, he threw hot coffee on the officer. Tr. 3663.

The next witness was Major Lamar Hunton, chief jailer for the Paulding County Jail. He testified that on the evening of December 30, 1996, there was a disturbance and he saw Officer Steve Garner being chased down the hall by Defendant Battle. He saw Battle jump on Garner from the back and begin striking Garner. Tr. 3669. After Battle was pulled off Garner he found a No. 2 pencil which Battle had used to assault Garner. Tr. 3670.

The government's last witness at the sentencing stage was David Garner, a corrections officer at the Paulding County Jail. Tr. 3947. Garner related the incident which occurred on December 30, 1996. He had opened the door to Battle's cell along with another officer. An inmate pushed a mop bucket into the cell. Tr. 3949. The Defendant charged out of the cell, Tr. 3950, and Garner turned and ran. The Defendant ran after Garner down the hall, caught up with him and began punching him with his fist and also a pencil. Tr. 3951. Battle was on top of Garner as he fell to the floor. Tr. 3951. Another corrections officer stopped the assault with pepper spray. Tr. 3952. Garner had scrapes, abrasions, and soreness on his chest and face from the incident. This incident had not been preceded by any threats by Defendant against Garner. Tr. 3953. On cross defense counsel brought out that when Garner had handed Battle his breakfast tray approximately two weeks before that, Garner had said, "Ma'am? Oh, excuse me, sir." Battle was insulted by this. Tr. 3954. The government then brought out that the Defendant had asked that the mop bucket be brought to his cell. Tr. 3955. Therefore, he knew that Garner was going to open the door in order to place the mop bucket in the cell. Tr. 3959.

The defense's first witness at the sentencing hearing was Danny Amos, an inmate who had been at USP Atlanta in 1994. He had known inmate Boone at USP Atlanta and had purchased drugs from him. Tr. 3677. He also testified he had seen Boone get drugs from Officer Washington at least three times. Tr. 3679. Amos said he had been involved in a vending machine theft on December 4, 1994, and he understood that Boone was going to give Washington some of the money. Tr. 3681. He learned of Washington's murder several days later.

Amos wrote a letter to Lieutenant Hill at the BOP naming Washington as a party to the vending machine theft. Tr. 3688. He stated he also discussed this matter with staff at the prison. Tr. 3689. Amos claimed he did not want to be present at the trial and that he was in fear of his life. Tr. 3691.

On cross Amos admitted that he had spent virtually his entire adult life in prison. Tr. 3693. He is serving multiple sentences. He also has outstanding sentences for escape. Tr. 3701. Amos admitted that he got money from the vending machine theft. Tr. 3709. In the letter he had written to Lieutenant Hill, he had stated that Washington had gotten the money from the theft. Tr. 3710. He claimed Washington had carried thousands of coins out of the institution in a gym bag. Tr. 3710. Amos testified he had been using heroin and cocaine while at USP Atlanta. Tr. 3727.

The next witness for the defense was Anthony Vasher. Vasher testified that before December 21, 1994, he had heard inmate Boone telling his cell mate, Amos, "He burnt us. He burnt us on our money." Tr. 3738. He said Amos had stated, "You need to handle that" or "You need to handle your business".

A couple of days later he heard on the news that Officer Washington had been attacked. Amos commented that was good and that Washington had gotten what was coming to him. Tr. 3740. He stated Amos had also said they gave the cop the quarters and he didn't bring the dope back in. That was how they got burned. Tr. 3741.

The next witness was Edward L. Cartwright, who had worked at USP Atlanta in December of 1994 as an investigator. He had investigated the vending machine theft and had determined that inmates had broken into a room where the vending machine money was kept in bags in a storage unit. Tr. 3758. He found some inmates in possession of some of the money.

The next witness was Andre Willis, who testified that he had known Boone at Paulding County Jail in 1995. Boone had told Willis that he had given Battle the hammer. Tr. 3772. Willis said Boone also told him that he (Boone) had tried to rinse the hammer off. Tr. 3772.

Willis said he did not think Washington had harassed or intimidated inmates. Tr. 3776. He denied having told anyone that Boone said he knew what Washington was going to do with the hammer. Tr. 3780.

The next witness was Tyrone Smith, an FBI agent who had interviewed Andre Willis at FCI Talladega. This was on January 26, 1995. On that date Willis told him that Boone had told him he had given the hammer to an inmate who was mad because Washington had told him to "get the hell out of bed". Tr. 3785.

The defense next called Charles White, a federal inmate serving time for kidnapping. In December of 1994 he was at USP Atlanta. Battle was in the neighboring cell. In response to the defense's question as to whether Battle had ever described to him anything unusual about things that might be in his body, White objected to answering the question and claimed he had been threatened by BOP employees in the courtroom who had earlier come by the Marshal's lockup during the lunch hour.

White then testified outside the jury's presence concerning intimidation by the BOP employees. The Court took considerable evidence in this matter from inmates and BOP employees and ultimately denied the defense's motion for mistrial. Tr. 3805 to 3930.

The defense's next witness at the sentencing phase was Richard Rogers, Ph.D. Dr. Rogers is a professor of psychology at the University of North Texas and has published articles on the subject of malingering. He had reviewed the testimony and test results of other mental health experts before testifying. He first testified that there was no evidence of malingering on the MMPI–II given by Hazelrigg. Tr. 3963. He testified that the F scale contains items which are fairly infrequent in the population. People who endorse these items are trying to "fake bad".

The K scale is designed to identify individuals who answer in a socially desirable or defensive fashion.

Rogers testified that the F minus K scale is a way of adjusting the scores on the MMPI so as to take into account an undue level of defensiveness. Tr. 3986. Rogers found that Battle's F minus K score on O'Hagan's MMPI was minus 13.

That score meant it was extremely likely that Battle was under reporting his symptoms or trying to "fake good."

On the MMPI–II administered by Hazelrigg, the F minus K score was minus 6, which Rogers admitted did not show faking good to any significant degree. Tr. 4000.

Rogers said that although the clinical scores on the 1987 MMPI are quite elevated, he could not say based on that alone that the Defendant was psychotic. Tr. 4004. On the 1987 test, F was greater than K so the F minus K score was a positive number.

Rogers testified at length about the SIRS test, of which he is the author. He ultimately agreed that Dr. Hazelrigg had correctly scored the test. Tr. 4065.

On cross, the government pointed out that if Battle had gotten one more point on the SIRS' "selective scale", he would have gone into the indeterminate range on malingering. Tr. 4027. Also, Rogers agreed that on the "rare symptom" scale, the Defendant had a score of 4 but if he had endorsed one additional rare symptom he would have gotten a score of 5. which would have put him into the probable range of malingering. Tr. 4030. It would have meant that the likelihood of honest responding would have gone down to 22.4 per cent. Tr. 4030.

Rogers testified that the SIRS test has 176 questions on it, with subparts to individual questions. He explained how the SIRS was set up initially. Dr. Rogers' group used experienced clinicians to identify individuals who were feigning mental illness. The test population included 36 feigners or malingerers and 170 plus simulators, normal people who were paid to participate in the project. The principle on which the test is based is that of determining whether the subject's response pattern to various questions is similar to that of the feigners or the simulators.

In response to the question: "To what extent could you say that this test gives insight into whether or not Mr. Battle is making up his claim that he has implants?" Tr. 4056–7. Dr. Rogers said, "We couldn't address specifics. We can only address whether he is making up overall his psychotic symptoms, but we couldn't address the specifics of them." Tr. 4057.

The defense's next witness was Ronald Walker, a BOP employee who worked at USP Atlanta when Washington was working there. He also knew Battle. Walker stated he did not think Battle had any mental problems. He denied previously telling defense counsel Kearns that Battle had mental problems or was crazy. He testified that an inmate asked him to talk to Officer Washington to tell him to stop harassing inmates. Tr. 4079.

On cross Walker stated that Washington was "a good, strict officer." Tr. 4080. He made the inmates clean up their cells. Tr. 4082. He never observed Washington being abusive to an inmate. Tr. 4083.

The defense's next witness was Jeffrey Barge, an inmate serving time for bank robbery. He knew Battle at USP Atlanta. He denied having told defense investigator Susan Miller that Battle is crazy. Subsequently, he said, "I thought he was kind of different." Tr. 4104.

Barge opined that Washington had a tendency to go too far with inmates, Tr. 4107, and that he talked to them in a rough way. He told Washington he needed to show more respect to the inmates. Tr. 4109.

The next witness was Ben Massengale who gave testimony about a vending machine theft at USP Atlanta in 1994. There was some suspicion that Officer Washington was involved. Tr. 4113.

The next witness was Evelyn Cuthbert, a BOP staff member at USP Atlanta. She testified she had overheard a conversation a couple of weeks before the assault on Washington in which some inmates were

talking and one of them said, "Washington is going to hook me up." Tr. 4119.

The next witness for the defense was Frank Shirley, an inmate who had known Battle at USP Atlanta. He had also known Washington. He testified that Washington had yelled obscenities at the inmates, that he did it regularly, and that it was not common for corrections officers to talk that way to inmates. Tr. 4127–28.

At that point Ben Massengale was recalled by the Defendant. He estimated that a lot of cash was carried out of USP Atlanta in coolers. Tr. 4132.

Charles White, an inmate at USP Atlanta in December 1994, spoke to Battle sometimes. Tr. 4147. He denied having previously told the defense investigator that Battle lay on the floor in his cell in order to block the monitoring that was bothering him. Tr. 4148. He denied having told defense investigator Susan Miller that Battle collected pie tins from the cafeteria so he could make a metal hat which would help keep out the noises he was hearing. Tr. 4149.

White testified that Officer Washington had crossed the line in dealing with inmates and that he was abusive and disrespectful. Tr. 4151. Washington cursed at the inmates. Tr. 4154. He remembered Washington standing between Battle and the TV in the common area so as to block Battle's view of the TV. Tr. 4157.

White admitted he had previously told the FBI that he knew of no reason why Battle would want to attack Washington. Tr. 4162.

The next witness for the defense was Lucious Johnson, a BOP investigator. He was involved in the investigation of the vending machine incident. Tr. 4202.

The defense's next witness was Gregory L. Hershberger, Warden of USP Administrative Maximum in Florence, Colorado. He had been the warden since January of 1996. ADX, also referred to as ADMAX, was designed to be the most secure facility in the Bureau of Prisons and is sometimes called "Alcatraz of the Rockies." Tr. 4219. ADX was the replacement for USP Marion and Marion replaced Alcatraz. Tr. 4220. ADX has a control unit which has capacity for 78 inmates and it is designed for inmates who have proven themselves to be a danger to staff or others in the prison system. Tr. 4220. Each cell in the control unit is self-contained, with shower built in. Tr. 4221–22. Solo recreation is available one hour a day in an enclosed nearby area. Tr. 4223. Inmates are allowed five visits per month. Tr. 4225. Restraints are applied and the inmate is taken to the visiting area. Tr. 4226. Inmates are allowed one 15 minute call every 30 days. Tr. 4227. Inmates are served meals in their cells. Tr. 4227.

Before an inmate is placed in the control unit, a determination is made as to the length of the confinement. The BOP's informal policy at ADX has been that for killing another inmate, the initial period in the control unit will be 72 months. Tr. 4230.

The time spent in the control unit can be reduced for exemplary behavior or it can been lengthened "where the inmate continues to be disruptive and has done assaults on staff and so forth in the control unit, we will extend that time period. So, it all depends on the particular person." Tr. 4231.

Under the Code of Federal Regulations, no inmates under the influence of psychotropic medication are allowed in the control unit. In that case, the individual would be sent to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. Tr. 4232. This facility is a very high security level facility. Tr. 4251.

There have been assaults by inmates in ADX's control unit. Tr. 4238. There are

inmates in general population at ADX who have murdered BOP staff. At the present time (March 1997) there were six who had committed murder. Four of those murdered were BOP staff. Tr. 4239. In general population only two rather than three officers escort each inmate. Tr. 4240. General population is allowed recreation with other inmates, up to twelve people at a time in outdoor recreation. Tr. 4241. ADX has a step down program which rewards good behavior. It ultimately allows redesignation to other penitentiaries. Tr. 4242. In the last twelve months of the program inmates who have stepped down from one phase to the next are in a unit where they gather in the dining hall, are not under restraints when they are around staff, and they work half days in the factory operation. After that they are eligible for designation to an open penitentiary such as Atlanta.

The incidence of assaults at ADX is about double that of open penitentiaries. Tr. 4245.

Hershberger testified that if Battle were assigned to the control unit at ADX, he would expect that he would be eligible at some point to go into the general population. Tr. 4249. Also, if he met the requirements for the step down program he would be considered for transfer to an open penitentiary such as Leavenworth, Lewisburg, Lompoc or Atlanta. Tr. 4249.

The defense's next witness was Christine Parker. She is Battle's sister. Tr. 4253. She is the second child in the family and he is the third. There are also four other brothers and sisters. Tr. 4253. The children grew up in North Carolina. She is employed as a garment worker at Wrangler Jeans. Tr. 4255. Their father was a sharecropper who worked on the farm. Tr. 4256. It was an isolated area. Tr. 4256. Their mother was constantly sick with asthma. Tr. 4257. The relationship between their mother and father was all right unless he drank, which he did on the weekends. Tr. 4258. Then he would go off on a binge and come home drunk and would get violent.

He beat their mother every weekend. Tr. 4259. The house had three bedrooms, a kitchen and an out house. Tr. 4260. The children had no toys. Tr. 4261. The children had hand-me-down clothes. Tr. 4261. The children went to school but irregularly. Tr. 4262. Harvesting the crop took priority over going to school. Tr. 4262. She recalls her father abusing her sister Gloria, herself, brother Leon and her sister Carolyn, but did not recall him abusing Anthony. Tr. 4263.

The children mostly got food from the neighbor's house. Tr. 4267. They had no phone or car. Tr. 4269.

For a while when they were in their teens, Christine and Anthony both lived at Gloria's house. Anthony had friends, he worked and was no problem. Tr. 4274.

Christine noticed a change in Anthony after Minnie's death. He started being withdrawn. Tr. 4277. He seemed fearful of people. Tr. 4279. Christine is back in touch with her father now. Tr. 4281. Her father has stopped drinking, Tr. 4281, and has been sober for eight or nine years.

She visited Anthony at Paulding County Jail and found he had changed. Whereas he used to be outgoing and outspoken he appeared depressed. Tr. 4282.

Ms. Parker then made a plea to the jury to spare her brother's life, stating that he has not gotten the help he needed "that he'd been crying out for so many years". Tr. 4284.

The next witness was Gloria Bandy, Battle's other sister who testified. She is his older sister. She is employed at Glennot Mills in Tarboro, North Carolina. She has a number of children who are doing well. Tr. 4299. She described the home they

grew up in as an old board house and said you could see through the floor. Tr. 4301. They used cardboard to cover breaks in the windows. Tr. 4301. She confirmed her father's drinking habits and abusive nature. Tr. 4304. She recalled seeing her father beat Anthony. Tr. 4305. Her father used an electric cord or a stick to beat them. Tr. 4306. She remembered Anthony trying to help his mother when she was being beaten. Tr. 4307. She confirmed the testimony of her sister Christine regarding not having toys or clothes. After her mother's death the abuse became focused on her. Tr. 4314. Her father was mean even when he was not drinking. Tr. 4315. She recalls an incident where her father had shot the shotgun inside the house. Tr. 4317. Anthony lived with Gloria until he married Minnie Foreman. Minnie died a year or a year and a half after they got married. Battle was in his early twenties then. He had lived with Gloria from the age of 10 or 11 until his marriage. Tr. 4333. During that time she required him to go to school. She never heard from his teachers that he was in trouble. The children would do the chores around the house and babysit. Tr. 4334. She does not recall Anthony drinking while he lived with them. Tr. 4335.

The children ultimately forgave their father. Tr. 4338. She noticed a change in Anthony after Minnie's death. Tr. 4342. He had become withdrawn whereas he used to be "the jokester of our family". She noticed that Anthony does not take care of himself and is not focused on what's going on around him. Tr. 4342. He seemed depressed at Butner. Tr. 4342.

She visited Anthony, apparently at Paulding County and found he was jumpy and was shaking. Tr. 4348. She had not seen him for almost ten years. Tr. 4348. She made a plea to the jury to spare her brother's life, stating he was not responsible for his actions and that he had not gotten the help he needed. She apologized to the Washington family. Tr. 4349.

The next witness for the defense was Jan Vogelsang, a licensed independent social worker who practices in Greenville, South Carolina. Tr. 4365. Her clients mostly are victims of crime. She does psychosocial assessments. Tr. 4371. Ms. Vogelsang identified Defendant's Exhibit 78, a family tree. She went on to describe Battle's early childhood and the situation of his family, basically covering testimony already given by Christine and Gloria. She said that the death of a mother for a boy age 4, 5 or 6 is especially difficult. She pointed out that an alcoholic parent is an adolescent parent emotionally. Tr. 4406. She recounted that Anthony was 7 years old when his father first took him to a "shot house" where liquor was served. Tr. 4409. She also said the shot houses that Anthony was taken to were extremely violent where it was not uncommon for the children to witness shootings, knifings and fights. Tr. 4410. For a while after Christine and Gloria moved out Anthony was basically on his own with his father. Sometimes Anthony lived in barns. Tr. 4414. Anthony was essentially homeless. Tr. 4416.

Ms. Vogelsang summarized the content of Battle's school records basically to the effect that he worked below grade level and that he was mischievous. Tr. 4451. She discussed how children from abusive homes are in a constant state of hyperarousal and that they have a difficult time with relationships.

Ms. Vogelsang concluded that all of the problems Battle had in childhood placed him at high risk to have problems later in life and to have problems with judgment, insight, decisionmaking and comprehension. Tr. 4477.

Battle was the defense's last witness. Just before Defendant testified, this collo- quy occurred outside the jury's presence:

THE COURT: Mr. Battle, you want- ed to talk about something.

THE DEFENDANT: Yes. I want to know whether I have a right to testify before this jury in this sentencing phase or whatever?

THE COURT: You do have the right to testify during the sentencing hearing.

THE DEFENDANT: I do?

THE COURT: Yes, sir, you do. And this is something that I had intended on talking with you about. Just like I told you last time, this is something that you should consult with your lawyers about.

Now, you have got two experienced lawyers, and they have got your best interests at heart. I don't know what they are advising you regarding testify- ing at this stage, but the likelihood is that you should follow their advice, but you are their client in this case. You are the person on trial, and you have the right to testify if you want to. In other words, you get to make the final decision on that.

I would strongly recommend to you, as I said, number one, that you follow their advice. Number two, however, if they are telling you they don't think that you should testify, but you are intending to do it anyway, then I would strongly recommend to you that you sit down and talk with them about your testimony. This case is a little bit unusual. Nor- mally in a criminal case we have the trial, we get the verdict, and if the de- fendant is found guilty, then at a later date we go on the sentencing, and nor- mally at the sentencing the defendant is asked if he would like to make a state- ment before the sentence is imposed.

THE DEFENDANT: So, actually, I get to elaborate on things before the jury goes up with the verdict, I mean the sentencing penalty?

THE COURT: Yes. What I'm say- ing -

THE DEFENDANT: I will get to talk to them before they go out to delib- erate?

THE COURT: You do get to talk before they go out to deliberate.

THE DEFENDANT: Great. That will be fine.

THE COURT: That's because this case is different, since it is a case where the jury could return the death penalty, we have a full sentencing hearing before the jury.

Now, the jury, as you know I'm sure from talking to your lawyers, is going to decide what the sentence will be in this case.

THE DEFENDANT: Yes.

THE COURT: They will decide whether or not the death penalty should be imposed. If the death penalty is not imposed, there will be an automatic non- parolable life sentence. So, in a sense, the jury is deciding between those two options.

Most typically what happens at a sen- tencing hearing before a judge is that the defendant, as I said, has the oppor- tunity to make a statement, and typical- ly at that time the defendant expresses remorse for having committed the crime, or they say to the judge whatever they think will be most helpful in getting a better sentence.

THE DEFENDANT: Okay.

THE COURT: And I would think that if you do decide to testify, that you need to give a lot of thought along with your lawyers to what you are going to say, because the jury will probably listen very carefully to what you say. They may or may not agree with you.

THE DEFENDANT: I'm sure they won't. I want to elaborate.

THE COURT: What I'm saying to you is this is something where you don't want to just get on the witness stand and say whatever comes into your head. You want to think about it in advance, and you want to talk about it with your lawyers.

I do want to tell you, however, there is one thing I will not let you do if you decide to testify, and that is I will not let you get on the witness stand and criticize your lawyers. That will not be allowed, and if you get on the witness stand and start talking about your lawyers doing a bad job, that will be the end of your testimony. Okay? So, just stay away from that.

THE DEFENDANT: That is agreeable, Your Honor.

THE COURT: Okay. Do you think you understand what I have just said?

THE DEFENDANT: Precisely.

Tr. 4085–88.

In response to his counsel's question, "And do you want to tell the jury how you feel today about what happened to Mr. Washington?", Battle responded in part, "The guy, you know, he acted like a dog. You know, he talked to you like a dog and, you know, he died like a dog." Tr. 4496.

The government's first rebuttal witness was Donald H. Johnson, an FBI agent. He participated in the investigation at the penitentiary on December 21, 1994. He interviewed inmate White at that time. He testified that White told him he knew of no reason why anyone would want to assault Officer Washington. Tr. 4507. It was then brought out on cross that White had also told Agent Johnson that Washington was not very professional, and that he played with the inmates. Tr. 4509.

The government's next rebuttal witness was Craig Robinson who worked in the same area at USP Atlanta as Officer Washington. He testified that Washington normally went to Mrs. Winner's, across the street from the penitentiary, for lunch. He did not remember him ever carrying a lunch cooler. They did not work together every single day. He testified he never observed Washington carrying anything that might have had a large number of coins in it out of the institution. He did not recall Washington carrying a tote bag or lunch pail. Tr. 4517. He testified he did hear Washington using profanity with the inmates. Tr. 4517. He did not believe Washington's conduct was out of line. Tr. 4518.

The government's next rebuttal witness was Daniel Fallen, a case manager at USP Atlanta. He identified a memorandum he had prepared and sent to Lieutenant Cartwright, apparently in December of 1994. Tr. 4520. The memorandum contained the content of an interview he had had with inmate Amos, who was assigned to him. The interview concerned an escape plot Amos had knowledge about. Tr. 4521. The memorandum referred to Amos' giving accurate information to Lieutenant Hill or Lieutenant Moran regarding the location of certain tools that had been involved in a robbery. Tr. 4520.

On cross examination Fallen related that the robbery was related to the escape plan. Tr. 4523. The memo referred to Boone's involvement in the escape/robbery plan. The memo further related "Boone is supposed to be working closely with an officer in C cell house who will remain unnamed at this time. Boone and the officer were supposed to be bringing drugs into the institution". Tr. 4525.

The government's final sentencing witness was John Dole, an employee of the Bureau of Prisons at FCI Talladega. In 1994–95 his duties included monitoring telephone calls made by inmates from within the institution. Based on a log

from the prison records, he identified calls made by the Defendant to area code 919 823–4239, his father's telephone number. Between December 23, 1994 through September 9, 1995, the Defendant made twelve telephone calls to that number. Dole identified Government's Exhibit 48, a tape recording of one of the telephone conversations which had occurred on May 6, 1995. The tape of the telephone call was played for the jury. The telephone call included small talk, including discussion of sports events and also an unapologetic reference to the attack on the guards at Talladega which had occurred approximately two weeks before that.

The government's argument at the end of the sentencing phase focused on Battle's dangerousness and the need to protect those in the prison, as well as the harm to the Battle family. The defense's argument focused on Battle's traumatic and abusive childhood, his mental illness, and the need for mercy. Defense counsel recited numerous Biblical passages.

Upon concluding its deliberations, the jury made written findings, Tr. 258, which included the following unanimous finding: "the Defendant has a low potential for rehabilitation, and that he is a danger to the lives and safety of other persons". Also, one or more members of the jury made the following findings: (1) "the Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, even though not so impaired as to constitute a defense to the charge," (2) "the Defendant committed the offense under severe emotional or mental disturbance", (3) "the Defendant was under unusual or substantial duress, even though not of such a degree as to constitute a defense to the charge," and (4) "there are factors in the Defendant's background, record or character that weigh against imposition of the death penalty."

The verdict form stated on its face that if any member of the jury did not find that the death penalty should be imposed, a nonparoleable life sentence would be imposed. Nonetheless, the jury unanimously determined that the death penalty should be imposed. As required by federal law, the Court did impose the death penalty.

Defendant appealed his conviction and sentence. He was represented on appeal by Stephanie Kearns and John R. Martin. The conviction and sentence were affirmed on April 28, 1999, and rehearing was denied on July 15, 1999. *U.S. v. Battle*, 173 F.3d 1343 (11th Cir.1999). Defendant's application for certiorari to the United States Supreme Court was denied on March 20, 2000. *Battle v. U.S.*, 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000).

On August 14, 2000, Ms. Kearns and Mr. Martin filed a motion seeking to be relieved as counsel. The motion specifically recited that there was a need for an investigation to determine whether the Defendant had received his constitutional right to the effective assistance of counsel during pretrial, trial and on the direct appeal. The motion pointed out that Ms. Kearns and Mr. Martin could not ethically represent Defendant Battle in investigating or making such a claim. The motion proposed that the Court appoint Monica Foster, an attorney in Indianapolis, Indiana who is experienced in death penalty work, and P. Bruce Kirwan, an Atlanta criminal defense attorney. The motion was discussed with counsel for both sides during a hearing held on August 15, 2000, which had previously been set to discuss other matters. In the course of the conversation, the Court expressed to counsel that it was unsure that it was necessary to appoint new counsel, inasmuch as in the Court's own observation Ms. Kearns and Mr. Martin had done a good job at trial

and were very experienced lawyers. The Court also expressed distaste for ineffective assistance of counsel claims in general, stating that they are harmful to the public's perception of the legal profession. In addition, the Court observed that 21 U.S.C. § 848(q)(4)(A), pursuant to which Mr. Martin and Ms. Kearns had been appointed, did not appear to contemplate that appointed trial counsel would be routinely replaced for § 2255 proceedings.

At the conclusion of the hearing, the Court took the matter under advisement. The Indianapolis attorney recommended by Ms. Kearns and Mr. Martin was ultimately unable to accept the case.

On December 7, 2000, the Court entered an order granting the motion to relieve appointed counsel which had been filed on August 14. The order mentioned the Court's reluctance to replace current counsel, but stated, "At the same time, it is absolutely correct that counsel cannot investigate any issues pertaining to their own ineffectiveness. Neither could they credibly raise any claims in a § 2255 motion." The Court then found that the best course was to appoint new counsel who would concentrate initially on the issue of whether there are any claims of ineffective assistance of counsel at the pretrial, trial or appellate stages which in good faith should be raised in a § 2255 petition. The Court held that should counsel determine that any such claims exist then new counsel would represent the Defendant in the § 2255 proceedings. The Court directed new counsel to file a report no later than January 30, 2001, describing any claims of ineffective assistance which they felt should be raised or alternatively a description of counsel's analysis which resulted in a determination that no claims exist which in good faith should be raised.

The December 7 order appointed P. Bruce Kirwan and Margaret Hills O'Donnell, for the purposes discussed in the order. The Court spoke with Mr. Kirwan and Ms. O'Donnell before appointing them and both agreed to serve.

On February 7, 2001, new counsel filed under seal an interim report to the Court regarding the matter of ineffective assistance of counsel. After reviewing that report, on February 14, 2001, counsel's appointment was reaffirmed to represent Defendant Battle for all purposes in preparing, filing and advocating a § 2255 petition.

On February 28, 2001, the parties presented to the Court a stipulation extending the time to file the petition through October 1, 2001. The Court approved the stipulation, but only through September 1. Subsequently, the Court extended the time to October 1, 2001.

On May 1, 2001, new counsel (Ms. O'Donnell and Mr. Kirwan) informed the Court by motion that they wished for Judy Clarke, Federal Defender for the Eastern District of Washington and Idaho, to be added as additional counsel or substitute counsel for Mr. Kirwan. The motion recited that prior to the appointment of new counsel, Federal Defender Stephanie Kearns, with the approval of the Administrative Office of the U.S. Courts, had asked Judy Clarke to assist with Mr. Battle's case. The motion stated that her assistance had been invaluable and that she "is now as knowledgeable about Mr. Battle's case and the issues as are undersigned counsel". The motion pointed out Ms. Clarke's considerable expertise in death penalty cases.

On May 2, 2001, the Court denied the motion to appoint Judy Clarke as additional counsel for Defendant Battle or in lieu of Mr. Kirwan. The Court noted its preference that at least one of counsel representing Mr. Battle be an attorney admitted to practice in the State of Georgia, and also noted that two lawyers were adequate

to handle the case. The Court also noted a possible conflict with having Ms. Clarke assert the ineffectiveness of Ms. Kearns. The Court was not required to state all of its reasons for not wishing to appoint Ms. Clarke, and did not do so.

The Court had two *ex parte* conferences with defense counsel in the summer of 2001, one attended only by Mr. Kirwan in June and one attended by both Ms. O'Donnell and Mr. Kirwan in July. The subject of Ms. Clarke's and Mr. O'Donnell's involvement were discussed and the court ruled again on these requests. Transcripts of both conferences, sealed at the request of the defense, are in the record. *See* Sealed Docket Nos. 318 and 340.

A letter from Ted Lidz, Chief of the Federal Defender Services Division at the Administrative Office of the U.S. Courts dated July 27, 2001, is contained in the pleadings file under seal as Docket No. 326. This letter explains from Mr. Lidz's standpoint the sequence of events regarding Ms. Clarke's participation in the case and his mis-assumption that this Court had approved the participation of Ms. Clarke and the use of the resources of her office.

On August 21, 2001, the Court entered a written order denying an additional motion to withdraw filed by P. Bruce Kirwan. This order also denied, for the reasons stated at the hearings in June and July, Ms. O'Donnell's request that her husband be allowed to act as her investigator in the instant case. This order emphasized again that counsel was free to consult with Ms. Clarke on an informal basis but that Ms. Clarke's participation would not be as counsel for Mr. Battle. Neither would the case be financed with resources allotted to Federal Defenders of the Eastern District of Washington and Idaho.

At a conference with counsel in May 2001, the Court directed that a budget be prepared and presented. The proposed budget was filed and to a great degree was approved by the undersigned and by the U.S. Court of Appeals pursuant to 21 U.S.C. § 848(q)(10)(B). These documents are contained in the record as sealed Docket Nos. 316, 321, 322, 324.

To date, counsel O'Donnell has been paid over $100,000 in fees for her services and a budget for the fees of experts, investigators, and a law clerk has been approved in the approximate amount of $38,000. The Court is satisfied that the resources available to Mr. Battle's counsel are ample for their requirements.

On October 1, 2001, Defendant filed a motion for a new trial and to vacate, set aside, and correct conviction and death sentence made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Civil Procedure. The § 2255 motion claims that Defendant did not receive a fair trial consistent with constitutional guarantees because of: ineffective assistance of counsel, bias of the trial judge, misconduct of the jury, and prosecutorial misconduct. Simultaneously Defendant filed a number of additional motions, as set forth above. These additional motions are before the Court, and the § 2255 motion is also currently before the Court for review under Rule 4 of the Rules Governing § 2255 proceedings for the United States District Courts.

*MOTIONS BEFORE THE COURT*

The Court will first turn to Defendant's Motion to Disqualify Judge Orinda D. Evans. This motion is brought under 28 U.S.C. §§ 144 and 455 pertaining to a judge's obligation to recuse when the judge has an alleged bias or prejudice against the Defendant. In the case of a § 455 motion, this obligation also exists where the judge's impartiality might reasonably be questioned. The standard under § 455 is "whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiali-

ty." *Christo v. Padgett,* 223 F.3d 1324, 1333 (11th Cir.2000).

Defendant seeks an evidentiary hearing on the motion to the extent it is brought under § 455.

■ The Court first turns to Defendant's § 144 motion. 28 U.S.C. § 144 provides as follows:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Because the Court is not called upon to determine the truth of the allegations of bias in a § 144 motion, the only questions are legal ones—whether Defendant has filed a "timely and sufficient" affidavit alleging bias made by a "party" and "a certificate of counsel of record stating that [the affidavit] is made in good faith." If so, recusal is mandated.

There are actually two affidavits (one of which is in the form of a declaration pursuant to 28 U.S.C. § 1746) and a certificate of one of defense counsel attached to the motion to disqualify. The motion was filed the same day as the § 2255 motion. The Court agrees with Defendant that § 144's requirement that the motion be filed at least 10 days before the beginning of the term of court is not applicable as there are no longer any "terms" of court. *Liteky v. United States,* 510 U.S. 540, 549, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The Court finds that the affidavit and declaration are timely filed. Also, a certificate of one of counsel of record has been filed certifying that the motion is made in good faith.

The Court finds, however, that neither the affidavit nor the declaration is made and filed by a "party" as required by § 144. Neither Ms. O'Donnell nor juror Fields is a "party". Ms. O'Donnell is one of post-conviction counsel for Mr. Battle and Mr. Fields was a juror at the trial.

In addition, Mr. Fields' affidavit is not "sufficient" because it does not assert, directly or indirectly, that the undersigned had or has a personal bias or prejudice against Defendant. Indeed, it appears likely that juror Fields had no knowledge or intent that his affidavit be used to urge bias of the trial judge.

■ The Court notes that the voluminous § 2255 motion (130 pages) contains numerous allegations of bias on the part of the trial judge occurring during the trial. *See* pp. 104–112 of § 2255 motion. While the Defendant did sign a verification with respect to the § 2255 motion, the verification recites only that he has been advised of its contents and arguments and that he has authorized counsel to file the § 2255 motion on his behalf. In addition, the allegations in the § 2255 motion pertaining to bias are highly argumentative and non-factual. The Court does not consider the § 2255 motion itself to be an affidavit of bias as required by § 144.

Because no sufficient affidavit has been filed by a party stating facts showing bias against the Defendant as required by § 144, Defendant's motion to disqualify based on 28 U.S.C. § 144 is DENIED.

The Court now turns to Defendant's motion to disqualify based on 28 U.S.C. § 455. That statute provides in pertinent part:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> . . .

■ Initially, it is noted that Defendant has requested that the instant motion to disqualify be assigned to a different U.S. District Judge for hearing and resolution. The undersigned agrees that this course of action would be mandated if resolution of disputed factual issues pertaining to the undersigned's conduct were involved. However, the only possible dispute of fact arises from this statement referenced in juror Fields' affidavit:

> When we agreed on the death penalty, there was one juror, a black lady who was very upset by this. She broke down and cried. She was still visibly upset in the jury room afterward when the judge came back to talk to us. I remember the judge thanking us and telling us that she thought we made the right decision.

I don't know if this made the lady feel any better or not.

Fields affidavit executed 9/24/01.

While the undersigned does question the quoted portion of the Fields' affidavit in part, the Court will accept it as true in ruling on Defendant's motion under § 455.[10] The other claims of bias are based on statements or actions reflected in the underlying motion to disqualify and are undisputed, in that they are reflected in the record and transcripts of proceedings in this case. Because the standard for reviewing a § 455 motion is an objective one, the facts are undisputed, and a review of the full record and transcript by another judge would considerably delay the proceedings, Defendant's request that another district judge be assigned to rule on the motion to disqualify is denied.

■ The seminal case regarding judicial disqualification under § 455 is *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The Supreme Court held that where the grounds asserted as establishing bias are not derived from outside (extrajudicial) sources, the movant must prove that the complained-of actions "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible". *Id.* at 556, 114 S.Ct. 1147. Because Defendant's claims in the instant case are derived from the undersigned's actions during trial and in post-conviction proceedings thereafter, this standard applies in this case.

---

10. Were a hearing held in this matter, the undersigned would testify that after the jury's death penalty determination had been received in open court and the sentence imposed, the trial judge exited the courtroom through the rear door which is immediately adjacent to the jury room where the jurors were still gathered. One juror was seated or standing adjacent to the open jury room door and was quite distraught. The undersigned spoke to her briefly, seeking to comfort her and other distraught jurors with the assurance that the jury had performed its job conscientiously and well. The Court's sole intent was to comfort these jurors. The undersigned has no specific recollection of the words she used, but is skeptical that she would have told the juror that the death sentence was "the right thing".

The motion to disqualify enumerates specific instances of conduct by the trial judge which are urged to justify disqualification under § 455. Each will be addressed in turn.

■ Defendant first argues in section III of the Motion to Disqualify that the undersigned must be disqualified because of actions taken in the post trial setting show that she cannot fairly consider petitioner's § 2255 motion. Mot. to Disqualify, p. 4. Defendant argues that remarks made by the Court at the August 15, 2000, conference with trial counsel concerning ineffective assistance of counsel claims, the manner in which post conviction counsel was appointed, current counsel's speculation that the Court would not have extended the statute of limitations without the government's consent, and the undersigned's refusal to appoint Judy Clarke as additional or substitute counsel reflect an inability to fairly consider the instant § 2255 motion. Defendant also cites the Court's refusal to allow Ms. O'Donnell's husband, Jack O'Donnell, to act as investigator in this case. Defendant characterizes these actions on the Court's part as interference in the work of defense counsel.

Turning first to comments made at the August 15, 2000 conference, the Court notes the instant case is the first federal death penalty case to have been prosecuted in Georgia, at least in modern times. The question presented, as the Court viewed it, was whether in a federal death penalty case in which highly qualified lawyers selected and appointed by the court have acted as trial counsel, the conduct of the trial does not itself suggest lack of skill or attention to the case by trial counsel, and defendant has not requested a change of counsel, it is necessary or appropriate for the Court to appoint new counsel in the post-conviction stage for the sole purpose of evaluating and asserting ineffective assistance of counsel claims against trial counsel. In evaluating this issue, the Court did comment about the negative impact on the public's perception of the justice system when trial counsel are routinely accused of unprofessional conduct.

The undersigned, having presided at the trial, had specific knowledge of counsel's performance in the courtroom. As a long time trial judge in this district, the undersigned is familiar with the ability and experience of Ms. Kearns, Director of the Federal Defender Program, Inc. in the Northern District of Georgia for many years, and with Mr. Martin's ability as a trial lawyer who has handled felony death penalty cases, both at the trial and post-conviction levels. The Court was also aware that this district's Federal Defender Program handles many and perhaps most of the appointed § 2254 death penalty cases in the Northern District of Georgia through a grant from the Administrative Office of the U.S. Courts. Thus, while Defendant may be correct that Ms. Kearns had not previously tried a death penalty case (apparently there had been no opportunity for her to do so) her familiarity with post-conviction death penalty work presumably is extensive.

The Court's comments at the August 15 conference should be considered along with other facts which are equally important. First, the Court did appoint new counsel to investigate possible ineffective assistance claims. Further, upon being advised of the results of new counsel's investigation, the Court did appoint counsel to pursue these claims and any others in a § 2255 motion. This was a discretionary determination by the Court. Routine replacement of trial counsel at the post-conviction stage is not mandated by statute. Secondly, it should be noted that of three state death penalty cases in which ineffective assistance claims have been

raised in cases assigned to this judge, in two the death sentences were set aside based on ineffective assistance of trial counsel. *See House v. Balkcom,* 725 F.2d 608, 614 (11th Cir.1984), cert. denied, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Hall v. Turpin,* Civil Action No. 1:97–cv–723–ODE, N.D. Ga. Aug. 15, 2001. *Cf. Housel v. Thomas,* No. 1:94–cv–1444–ODE, 1997 WL 67823 (N.D.Ga. Feb. 11, 1997). The Court's decisions in these cases speak much more loudly to the question whether the Court can and will recognize ineffective assistance of counsel when shown by the evidence than off-the-cuff comments at a conference in chambers with counsel. The Court emphasizes that it would not hesitate to find that trial counsel provided ineffective assistance to Defendant Battle if the evidence so established.

Finally, the Court's comments at the August 15, 2000, conference should be considered within the context of the entire conversation between counsel and the Court. The transcript was sealed at the request of trial defense counsel.[11] *See* Sealed Docket Nos. 298 and 350.

■ The Court's actions in declining to appoint Judy Clarke as additional of substitute counsel, and Ms. O'Donnell's husband as investigator do not show a bias or predisposition. The court has the responsibility to appoint counsel for an indigent defendant and to oversee proper use of government funds when appointments are made under the Criminal Justice Act. When new post-conviction counsel were appointed, the Court did not know that appointed counsel expected to utilize the resources and services of another Federal Defender Program office, or of the identity

of Ms. Clarke as the attorney who would be working on the case. The Court's decision not to allow Ms. Clarke to participate as counsel, or to allow her office to fund the case, does not in any respect reflect bias or prejudice against the Defendant, particularly since ample other resources have been allotted to the defense. Rather, these matters are simply an exercise of the Court's role in overseeing the work of appointed counsel and in fulfilling its obligations under 21 U.S.C. § 848(q) to oversee the reasonable use of government funds in prosecuting the case.

Regarding Ms. O'Donnell's utilization of her husband as her investigator, the record reflects that the Court expressed misgivings about this because counsel wished to use her husband to testify, in the event that a witness who had been interviewed changed his or her story at the § 2255 hearing. In the Court's view, it was best to avoid the potential problem of Mr. O'Donnell testifying in a case in which his wife is lead counsel for the defense. Apparently, Mr. O'Donnell had begun serving as investigator under an arrangement with Ms. Clarke's office. Had the Court been aware of this arrangement, it would have disallowed it *ab initio.*

The mere fact that the Court has carried out its statutory and legal obligations in a manner not preferred by defense counsel does not mean that the judge is biased against the Defendant. It certainly does not mean that the judge harbors an aversion or hostility to the defense or the Defendant, nor does it reflect a state of mind "so resistant to a fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable

11. Ms. O'Donnell is admonished that sealed portions of the record should not be quoted in a publicly filed document including briefs. A number of sealed documents were unsealed for the sole purpose of providing copies to

Ms. O'Donnell and Mr. Kirwan. However, the documents remain sealed. Counsel may either ask that sealed documents be unsealed or make a separate sealed filing.

grounds to question the neutral and objective character of a judge's rulings or findings." *Liteky* at 557–58, 114 S.Ct. 1147.

In section IV of the Motion to Disqualify, Defendant urges that the trial judge's conduct at trial "reflects an interest in the outcome, brings her impartiality into question, and shows her to be biased and prejudiced against petitioner". Mot. p. 9.

The Defendant cites a number of actions allegedly taken or not taken by the judge at trial which are argued to reflect bias and prejudice against Defendant. However, Defendant's claims do not address instances of bias, much less bias derived from an extrajudicial source. Rather, these allegations, with one exception, pertain to rulings of the trial court with which Defendant disagrees. Finally, many of the contentions made by Defendant are based on incorrect factual or legal assumptions.

In the interest of clarity, Defendant's allegations of bias and prejudice in the conduct of the trial are set out as alleged by Defendant in the Motion to Disqualify, *ad seriatim.*

> Judge Evans began Petitioners trial by refusing to reconsider the issue of his competency, even in the face of his trial lawyers' begging her for the delay of just one afternoon.

The Court did decline to reconsider the issue of competency at the beginning of the trial. The Court knew, as a function of its review of the evidence pertaining to the Defendant's competency, that the Defendant did not desire a trial and that all possible outcomes of the trial, except a mistrial or negotiated plea agreement calling for a six month sentence, were unacceptable to Defendant. Defendant's announcement that he was not willing to participate was not unexpected. It is unclear why defense counsel asserts this refusal reflected bias against the Defendant.

> Knowing of the conflict between petitioner's lawyers and petitioner about the defense of insanity, Judge Evans locked the petitioner into the defense after permitting his lawyers to raise it, but refusing to permit him to withdraw the defense.

■ Defense counsel were aware before the case began that the last point in time for a decision to raise an insanity defense was during the opening statement of counsel. This requirement was simply a function of the fact that an insanity defense allows the admission of psychiatric evidence which would not be admissible in a case in which only *mens rea*, as opposed to insanity, is at issue. *U.S. v. Westcott,* 83 F.3d 1354 (11th Cir.1996). In order to correctly rule on evidentiary objections to mental health evidence, the Court must know whether an insanity defense is being asserted. Also, where an insanity defense is presented, the order of evidence is affected. Counsel are entitled to know what the order of proof will be before the trial begins.

Defense counsel did not ask to withdraw the defense of insanity. Had they done so, the Court would have denied the request as untimely. Also, the Court had no obligation and probably no right to intervene by asking the Defendant personally whether he wanted to withdraw his insanity defense notwithstanding his counsel's advice. An implicit part of Defendant's argument is that he had the right to make the final decision whether to withdraw the insanity defense in lieu of that decision being made by counsel, after consulting the Defendant. The defense cites no authority for the proposition that Defendant had that right. The Court is skeptical that the Defendant has a "fundamental right" *cf. U.S. v. Teague,* 953 F.2d 1525 (11th Cir.1992)(fundamental right of Defendant to testify on his own behalf) to make the final decision whether to withdraw an insanity defense, particularly where several expert wit-

nesses supported the defense. *See Weeks v. Jones*, 26 F.3d 1030 (11th Cir.1994) (counsel's decision not to assert an insanity defense, when supporting evidence was weak held a strategic decision properly made by counsel); *U.S. v. Edwards*, 488 F.2d 1154 (5th Cir.1974) (counsel's decision not to raise insanity defense held a proper trial tactic decision of counsel); *U.S. v. Hayes*, 589 F.2d 811 (5th Cir.1979) (counsel's mid-trial decision not to request instructions on insanity defense held a strategic decision of counsel).

Rather than consulting petitioner and permitting him to control the decision which effectively changed his plea from "not guilty" to "not guilty by reason of insanity", Judge Evans provoked petitioner into testifying against himself to override his lawyers.

The record reflects that Defendant never changed his plea from not guilty to "not guilty by reason of insanity". He did urge through counsel that he was not guilty by reason of insanity. However, the Defendant was not handicapped in any way by having both arguments made on his behalf. Defendant was not required to acknowledge guilt in order to pursue an insanity defense. *See* 18 U.S.C. § 4242. Rule 11(a), Fed.R.Crim.P., does not recognize a plea of not guilty by reason of insanity. The method of asserting the defense is by motion under § 4242. When such a motion is filed, the jury will determine whether the defendant is guilty, not guilty, or not guilty only by reason of insanity. 18 U.S.C. § 4242(b).

Regarding the Court's advice to the Defendant that he had the right to testify in his own behalf, this advice was mandated under Eleventh Circuit precedent which holds that a defendant's right to testify in his own behalf is a fundamental right which cannot be overridden by counsel. *U.S. v. Teague*, 953 F.2d 1525 (11th Cir. 1992). In advising Defendant of his right to testify pursuant to *Teague*, the Court was careful to encourage Defendant to follow the advice of his lawyers. The Court's advice to Defendant regarding his right to testify was warranted under *Teague*. Had the Court prevented Defendant from testifying, reversible error would have occurred under the law of the Eleventh Circuit.

> Even after repeated requests by petitioner, Judge Evans refused to permit him to leave the courtroom until she was frustrated with his outbursts.

■ The Court declined to allow the Defendant to voluntarily absent himself from the trial in the face of *Diaz v. United States*, 223 U.S. 442, 445, 32 S.Ct. 250, 56 L.Ed. 500 (1912), in which the Supreme Court held that the defendant's presence is not waivable in a capital case. It is also correct that Defendant was excluded from the courtroom and required to view the proceedings over closed circuit television after being unruly. However, neither of these facts in any way pertains to issues of bias or prejudice but rather the administration of justice in the manner required by law.

> When selecting the jury, rather than following the practice of almost every other federal court to have tried a death penalty case, Judge Evans refused to permit in court questioning of jurors about their views on the death penalty.

The record reflects that the Court utilized both a questionnaire which had been prepared by the Court and counsel in part to ascertain jurors' views on the death penalty as well as extensive in-court questioning. The in-court questioning was of high quality. Both Court and counsel participated in individual voir dire on death penalty views which was conducted outside the presence of other jurors. *See* Tr. 147–158; 165–168; 312–358; 412–468; 472–503; 511–512; 514–518; 522–523; 524–526;

527–530; 531–537; 538–539; 541–542; 548–552; 562–565; 586–588; 590–592; 609–617; 619–620; 625–627.

Judge Evans was aware of jurors sleeping throughout portions of the trial, yet took no corrective action.

 The record reflects that before court opened on Thursday, February 27, government counsel informed the Court "We are concerned that there is a juror who appears to be dozing". Tr. 1590. Counsel's reference was to a juror's conduct on the preceding day. Neither the Court nor either of defense counsel knew which juror was referenced. Tr. 1590. Government counsel's description of the juror was insufficient to identify her to the Court. The Court indicated: "I have noticed a woman, but I think this is the heavyset woman who sometimes has her eyes squinted, but in my opinion she is not asleep." Tr. 1591. One of government counsel said, "She is trying to stay awake. When I'm looking at her, you can tell she is really fighting it." Tr. 1591. The Court stated: "I'll watch, and you all tell me what she has on today but I watch the jurors pretty closely, and if this had continued for any period of time, I would have seen it". Tr. 1591.... "I'll certainly keep a lookout". Tr. 1592. Shortly thereafter the jurors entered the courtroom. Tr. 1594.

The next mention of sleeping jurors was on Tuesday morning, March 4, approximately one-third of the way through the day's proceedings. Tr.1982. At that time one of defense counsel stated at a bench conference: "...I have noticed that the very first juror who is in sort of a sweatsuit, and the white juror with blond hair on the very first row on the far right appeared to be sleeping much of the time today... She has her eyes closed". Tr.1982. The Court stated, "From time to time she does". Tr.1982. Defense counsel then stated, "And I have noticed that from time to time, but the last minute, almost for a minute she had her eyes closed, and it seems to me that's getting to be a problem, and I just wanted to note it". Tr.1982. The Court stated, "Thank you for bringing that to my attention". Tr.1982.

The Defendant argues that the Court's failure to take corrective action reflects bias and prejudice against the Defendant. Defendant suggests that the Court should have "said [something] to the jurors, held a hearing to determine which jurors had been sleeping, whether in fact they missed testimony, how often, and how much testimony they missed". § 2255 motion, p. 73.

The Court disagrees that an inference of bias against the Defendant may be drawn from the foregoing facts, including the Court's failure to take the steps currently advocated by Defendant. It is also unfair to assume that the Court took no action, when the Court stated that it would be watchful to identify inattentive jurors. The record does reflect the intervention of a Court Security Officer, an agent of the Court, in assisting with one juror.

[The court] gave the jurors little time for personal business in the five-day-a-week, 9 a.m. to 5 p.m. trial schedule. The foreperson, an African–American woman, was discharged, during the penalty phase, when she was 85 minutes late, even though she had called from the vehicle license plate office where she was delayed trying to renew her expired car tags. This juror had deliberated the guilt phase, and had been a conscientious foreperson—until discharged.

 The trial record reflects that court sessions began each day at 9:30 a.m. and went until 5:00 p.m. with few exceptions. The record also reflects that Ms. Craft, the African–American foreperson of the jury, was excused during the penalty phase of the trial after it became clear that she was

not functioning as a responsible juror. The culminating event occurred after she informed the Court, through a note signed by herself as foreperson, that the jury wanted to start at 10:00 at least one day a week to allow them to attend to personal business, mainly banking business. Tr. 4058. The Court addressed the jury in the courtroom and asked them whether they wanted to start court at 10:00 a.m. the next day. Tr. 4178. The jurors responded in a chorus that they wanted to start at 9:30. Tr. 4180. The next morning, Ms. Craft did not arrive at 9:30 notwithstanding the decision of her fellow jurors. As the record reflects, a recorded telephone message from Ms. Craft at 9:57 a.m. stated that she had gone to have her license tag renewed and that she would be in court by 10:30. Tr. 4200. Ms. Craft had said nothing to court personnel concerning her intention to arrive late and had not explained any circumstances pertaining to her motor vehicle tag. When 10:30 arrived and Ms. Craft was not present, the Court replaced her with an alternate. She did not arrive in court until 10:55 a.m., at which point she was informed that she had been excused. Thus, the record makes it clear that a consideration other than bias against the Defendant caused Ms. Craft's dismissal. Rather, the Court's decision was simply based on considerations of the administration of justice.

The defense's argument that the Court treated Dedra Grant, a white juror who arrived a few minutes late one morning, more favorably than Ms. Craft, is incorrect. When Ms. Craft did not arrive at 9:30 a.m. on March 18, the Court commented, "We are missing one juror still. Mrs. Craft is not here, but we will wait a few minutes." Tr. 4185. Subsequently the Court determined that it would wait until 10:30. In the case of juror Grant the Court noted that Ms. Grant was not present at the time scheduled for the opening of court, but also noted that inbound traffic from the juror's area had been stopped due to a suspicious knapsack being found on the expressway. Tr. 2863. The Court directed that her home be contacted and that a decision regarding the juror be deferred for "a little while". Tr. 2863. While the record does not reflect the exact time of Ms. Grant's subsequent arrival, it is inferable that the delay was not lengthy. See Tr. 2869. "The juror is here and we are ready". Thus, the Defendant is in error in comparing the situations of Ms. Craft and Ms. Grant. The record refutes a factual basis for the contention that bias was shown in excusing Ms. Craft but not Ms. Grant.

> Judge Evans excluded the testimony of the defense malingering expert from the guilt phase of the case ... and when Dr. Richard Rogers did testify at the penalty phase, Judge Evans made clear her distaste for his testimony by interrupting his testimony on direct at least fourteen separate times....

The Court did rule that Dr. Rogers' testimony was not in the nature of rebuttal. He did testify at the penalty phase. The Court did ask him a number of questions, but does not believe these questions, which were calculated to assist the Court and jury in understanding his testimony, were inappropriate in any way.

> [The Court] permitted highly prejudicial hearsay testimony from the correctional officers during the penalty phase, but at the same time gutted hearsay testimony of the defense social historian, even though the rules of evidence are less stringent in federal capital sentencing proceedings.

▮ The Court's decision to allow the corrections officers to testify concerning the effects of Washington's murder on the prison population was legally correct. See U.S. v. Battle, 173 F.3d 1343, 1349 (11th Cir.1999). The fact that the offense in-

volved the murder of a corrections officer by an inmate already serving a life sentence is at the heart of the very charge against the Defendant. The testimony by the officers that the prison population was emboldened by Officer Washington's murder was not hearsay. Neither was their observation that within a prison population consisting of inmates serving life sentences or extremely lengthy prison sentences, the death penalty is the only real deterrent.

The record reflects that Jan Vogelsang, the defense's social historian, gave extensive testimony concerning the Defendant's upbringing and the connection it had to his ultimate involvement with the law. Tr. 4365–4417; 4449–4493. Ms. Vogelsang was not permitted to testify that the Defendant's father was a paranoid schizophrenic, when the family members present did not so testify and there were no medical or other records backing up this claim. In fact, the Court was never informed of the source of the information that Defendant's father is paranoid schizophrenic. While hearsay evidence is admissible at a sentencing hearing, some threshold of reliability is required, particularly where the evidence is very prejudicial. Because there was a sharp conflict of opinion as to whether Defendant was suffering from paranoid schizophrenia, the social worker's bald contention that his father was a paranoid schizophrenic was properly disallowed.

> When Judge Evans talked *ex parte* and off the record to the jurors in this capital case after the death sentence was imposed, she made comments which in the mind of at least one juror told them they had made the right decision.
>
> This matter is discussed on pages 84–85 above.

■ Regarding Defendant's contention that the Court inappropriately spoke with jurors after the trial and told them they had made the right decision, the Court believes that had this comment been made, it would have been unwise, but not reflective of personal bias against the Defendant.

Defendant's motion to disqualify also incorporates by reference allegations of bias against the trial judge set out in the § 2255 motion, p. 104–112. The allegations in this part of the motion are largely duplicated by the allegations in the Motion to Disqualify. However, a few separate allegations are made and will be addressed.

> The trial judge also failed, at the conclusion of the guilt phase, to discharge the alternate jurors. § 2255 motion, p. 111.

The version of Rule 24(c), Fed.R.Crim. P., in effect at the time of trial stated in part: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Defendant claims that the Court's failure to discharge the alternate after the guilt/insanity phase of the trial violated Rule 24(c) and that the Court's failure to do so reflects bias against Defendant.

The Court disagrees that the issue of bias is in any way related to the fact that the alternates were not discharged after the jury retired in the guilt/insanity phase of the deliberations. Secondly, the Court disagrees that Rule 24(c) was intended to operate in the manner the defense suggests in a case which is tried in two phases.

> The trial judge also ... discharged Juror Tooley without just cause and sufficient inquiry. § 2255 motion, p 111.

■ Juror Tooley was an African–American male juror who voiced concerns about the financial hardship he was experiencing on account of jury service. The record reflects that the Court went to great lengths to obtain juror Tooley's voluntary cooperation, and only discharged

him when he threatened, more than once, that he would be "biased" absent some financial relief. *See* Tr. 1311–13, 1592–93, 3454–66, 3614–24. There is no basis in the record permitting an inference of bias against juror Tooley or the Defendant on account of juror Tooley's dismissal.

In summary, the Court's actions whether viewed individually or collectively do not reflect bias against the Defendant. For the most part, the matters referenced pertain to routine rulings and administration of the case. The defense obviously does not agree with the decisions of the Court, but that does not mean that the trial judge is biased, or that disqualification under *Liteky* is warranted.

Most importantly, the overall fairness of the trial judge's actions affecting the Defendant must be judged by an overall review of the proceedings. While the unpredictability of the Defendant's behavior and his intermittent unruliness made the trial more difficult than it would have been otherwise, the record reflects that all of the participants in the trial—including the Defendant and his counsel—were consistently treated with respect and dignity by the Court. The only complaint raised by Defendant which even merits discussion is the comment attributed to the trial judge at the conclusion of the proceedings, that the jury had "done the right thing". Because the trial was at an end, the private view attributed to the Court had no possible impact on the integrity or fairness of the trial and sentencing proceedings. Furthermore, in the instant § 2255 proceedings the question is not whether the jury "made the right decision" as to the penalty it imposed, but rather whether the overall quality of Defendant's trial including the performance of defense counsel fell below constitutional norms.

Claim that the Trial Judge is a Material Witness *to Disputed Facts which May Arise in the § 2255 Hearing*

The defense asserts that the undersigned must be disqualified from handling the § 2255 proceedings because, having been the trial judge, the undersigned has "personal knowledge of disputed evidentiary facts concerning the proceedings". *See* § 455(b)(1). The subjects concerning which the defense anticipates questioning the trial judge during the § 2255 proceedings are the issues of sleeping jurors, petitioner's deteriorating physical and mental condition, comments made to the Court by the U.S. Marshals investigating the lock up tour, and comments to jurors about their verdict. Motion, p. 11.

The undersigned disagrees that she is a necessary or even an appropriate witness to these matters. Trial judges routinely observe and acquire knowledge concerning the cases over which they preside, but that does not automatically mean that the trial judge is a necessary or even an appropriate witness in a collateral attack on the sentence or judgment. As to all of the topics mentioned by defense counsel, there would be innumerable witnesses other than the trial judge who could be called to testify. If indeed there are disputes of fact, the Court can fairly resolve them based on the evidence. The mere fact that the trial judge has residual mental impressions from the trial is not disqualifying. In fact, it is very much in the interest of the fair and efficient administration of justice that the judge most familiar with the case handle the post-conviction proceedings. Otherwise, a new judge would have to familiarize himself or herself with an extensive record. It is predictable that this alone would cause significant delay.

Section 455(b)(1) does not require disqualification merely because the judicial officer has knowledge about a party or an

issue based on a prior judicial proceeding before the officer. *Christo v. Padgett,* 223 F.3d 1324, 1334 (11th Cir.2000); *Jaffe v. Grant,* 793 F.2d 1182 (11th Cir.1986).

For the foregoing reasons, Defendant's motion to disqualify the undersigned judge under 28 U.S.C. § 455 is DENIED.

 The Court next turns to Defendant's motion to randomly assign 28 U.S.C. 2255 habeas proceedings to another judge. The government has filed a response, opposing the motion. The defense has filed a reply.

The thrust of Defendant's motion is that 28 U.S.C. § 2255's requirement that the 2255 motion be filed in the court which imposed the sentence violates the Defendant's rights under the Fifth and Eighth Amendments and impinges on a capital defendant's right of collateral attack. The Defendant claims that having the same court (specifically, the same judge) who presided at the trial conduct the collateral review is faulty because "there is no fresh look at the issues, or new review of constitutional errors." Mot. p. 2. Also, Defendant points out that in § 2254 applications by state prisoners, the collateral review is necessarily by a new judge in federal court; Defendant contends the difference between state and federal habeas review procedure violates equal protection. Finally, Defendant argues that "the trial judge has an investment in the verdict, having not lightly imposed a sentence of death, and in this case, having already denied a motion for new trial based on both renewed arguments and new evidence."

In its response, the government points out that the United States Supreme Court has noted with apparent approval that § 2255 is designed to require that the collateral review be done in the sentencing court, citing *United States v. Hayman,* 342 U.S. 205, 220, 72 S.Ct. 263, 96 L.Ed. 232 (1952). In precedent binding in this circuit, the Fifth Circuit has noted that the policy behind § 2255's requirement that the sentencing judge handle the § 2255 motion is sound. *Morrison v. U.S.,* 432 F.2d 1227 (5th Cir.1970). The government further points out that none of the federal statutory provisions pertaining to death penalty cases call for a different procedure in death penalty § 2255 cases. The government further argues that in any case in which a trial judge is hearing a post verdict motion, the judge necessarily must review action taken at earlier stages in the proceeding. Finally, in a federal death penalty case the death penalty is imposed by the jury, not the trial judge.

In his reply, Defendant points out that there is some scholarly criticism of the procedure under § 2255 of having the sentencing judge preside at the collateral proceedings. Also, some cases outside the Eleventh Circuit have recognized that this procedure is not ironclad in all cases.

Having considered the motion, response and reply, the motion is DENIED. Counsel has cited no statutory authority or case law which requires that a court or judge other than the original sentencing court/judge be assigned to hear the § 2255 motion. The Defendant has cited no authority in support of his equal protection claim. The Court does not doubt its ability to fairly consider Defendant's motion brought under 28 U.S.C. § 2255. Furthermore, reassigning the instant case, with its voluminous record, to a new judge at this point would unnecessarily delay the proceedings.

The Court now turns to Defendant's motion captioned Motion to Compel BOP to Cooperate with Ongoing Investigation of this Case. The government has filed a response opposing the motion and the Defendant has filed a reply thereto.

Essentially, Defendant's motion complains that the refusal of various BOP personnel to grant interviews to her con-

stitutes an unwarranted interference with her investigation. The motion attaches a letter sent by counsel O'Donnell to Dr. Kathleen Hawk Sawyer, Director of the Bureau of Prisons on August 16, 2001, as well as Dr. Sawyer's letter of response to Ms. O'Donnell dated September 12, 2001. Ms. O'Donnell's letter recites the numerous instances in which BOP officials or employees have refused to speak with her investigators. Dr. Sawyer's letter of response refers to federal regulations which prohibit the disclosure of non-public information absent proper clearances or a court order. Additionally, Dr. Sawyer's response refers to the fact that the BOP has provided information to the defense under the Freedom of Information Act on an expedited basis and that nearly 2000 pages of records have been provided pursuant to FOIA requests.

The government's response is basically that the Defendant's motion for an order compelling BOP employees to submit to interviews is premature. The government points out, apparently correctly, that the defense has not complied with DOJ regulations which prohibit DOJ employees from disclosing information that the employees acquire through the performance of their duties without prior approval of the proper DOJ authorities. *See* 28 C.F.R. § 16.21, *et seq.*

Defendant's reply in turn requests that the government allow the interview of over 50 individuals who apparently are employed by the Bureau of Prisons. The defense states its request is made pursuant to 28 C.F.R. § 16.21, *et seq.* and *US ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951). No information is provided as to what inquiries would be made of these persons.

Having reviewed the motion, the response and reply, the motion is hereby DISMISSED as premature.

The Court now turns to the defense's next motion, which is captioned Motion to Cease Court's Continued Direction, Restrictions Upon and Interference With the Work of Habeas Counsel. The government has filed a response opposing the motion and defendant has filed a reply.

The Court considers the instant motion, both as to its caption and its content, to be frivolous and bordering on the contemptuous. Counsel is admonished to avoid disrespectful expression or conduct directed at the court. Also, counsel should refrain from filing motions which do not have a good faith, legitimate basis. For 'those reasons, the motion is DISMISSED.

The Court now turns to petitioner's motion captioned Petitioner's Objection to the October 2, 2001 Statute of Limitations and Being Required to File His 28 U.S.C. 2255 Motion Prior to the Completion of All Necessary Investigation Which Had Been Hindered by the Ruling of the Court, or in the Alternative, Petitioner's Renewed Motion to Toll the Statute of Limitations or Alternative Request for Liberal Permission to Amend. The government has filed a responsive objection and the defense has filed a reply.

The Court notes Defendant's objection to the October 1, 2001, statute of limitations. Petitioner's alternative request for liberal permission to amend is noted, but the Court finds it is premature. Should Defendant Battle determine that additional grounds should be added to the § 2255 petition, the proper procedure is to set out the proposed amendment together with a motion for leave to amend. The Defendant is cautioned, however, that all necessary investigation should be concluded without delay. Counsel has been working on the instant case for over a year at this point, and motions to amend the § 2255 petition will not be automatically granted.

1352

It appearing that no action is required by the Court at this time on the subject motion, it is DISMISSED.

The instant § 2255 petition is also before the Court at this time for preliminary review under Rule 4 of the Rules Governing § 2255 Proceedings for the United States District Courts. The Court having reviewed the § 2255 motion, together with the files, records and transcripts, and being of the opinion that it does not plainly appear that the movant is entitled to no relief, an answer or other pleading is required by the United States Attorney. Accordingly, the United States Attorney is directed to file an answer or other pleading in compliance with Rule 4. This date, which was set by previous order of the Court, is January 2, 2002.